## IN THE CIRCUIT COURT OF UNION COUNTY, ARKANSAS
## CIVIL DIVISION

| | |
|---|---|
| **EL DORADO AMMONIA, L.L.C. and** § | |
| **EL DORADO CHEMICAL COMPANY** § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **Case No. 70CV-17-** 473-6. |
| § | |
| **BENHAM CONSTRUCTORS, L.L.C., LEIDOS** § | |
| **ENGINEERING, LLC and LEIDOS, INC.,** § | |
| **Defendants** § | |

---

## COMPLAINT

---

Plaintiffs El Dorado Ammonia, L.L.C. ("EDA") and El Dorado Chemical Company ("EDC") hereby set forth claims for relief against: (1) Benham Constructors, L.L.C., formerly known as Leidos Constructors, L.L.C., formerly known as SAIC Constructors, L.L.C., (hereinafter "Leidos"); (2) Leidos, Inc., formerly known as Science Applications International Corporation (hereinafter "Leidos Guarantor"); and (3) Leidos Engineering, LLC, formerly known as SAIC Engineering, Environment & Infrastructure, LLC (hereinafter "Leidos Engineering").

## I.
## INTRODUCTION

1.    EDA and EDC bring this action against Leidos as a result of material breaches by Leidos of: (1) its Engineering, Procurement, and Construction Agreement with EDA for the construction of an ammonia plant in El Dorado, Arkansas ("Ammonia EPC Contract"); (2) its Engineering, Procurement, and Construction Agreement with EDC for outside battery limits work to supply utilities and product transfers between new process units and existing plant units ("OSBL EPC Contract"); and (3) other legal duties owed to EDA and EDC, including but not

**FILED**
12\20\17 @ 8:47 am
CHERYL COCHRAN-WILSON, CLERK
BY_____ D.C.

1

limited to negligence, gross negligence, and fraud.

2.      EDA brings this action against Leidos Engineering as a result of material breaches of Purchase Order 100019 ("Ammonia Engineering Contract"), which incorporated and governed the engineering services described in Exhibit B to the Ammonia EPC Contract.

3.      At all times relevant herein, Leidos was the general contractor and Leidos Engineering was the design engineer for these projects. Both of these entities were responsible for the timely completion of the ammonia plant project and OSBL projects in compliance with applicable contract provisions. With respect to the engineering work, Leidos Engineering owed EDA extra-contractual legal duties of care applicable to engineering firms designing chemical process plants and equipment.

4.      Unfortunately, and without EDA and EDC's knowledge, during the course of performance of the Ammonia EPC Contract, the OSBL EPC Contract, and the Ammonia Engineering Contract, Leidos and Leidos Engineering not only breached contractual and legal duties owed to EDA and EDC, but engaged in a course of conduct characterized by mismanagement, gross negligence, repeated misrepresentations, and fraud. This caused serious injury and damage to both EDA and EDC.

5.      Contemporaneously with the execution of the Ammonia and OSBL EPC Contracts, Guaranty Agreements were executed by the Leidos Guarantor in favor of EDA as beneficiary under the Ammonia EPC Contract and in favor of EDC as beneficiary under the OSBL EPC Contract. Under the two Guaranty Agreements, the Leidos Guarantor unconditionally, absolutely, and irrevocably guaranteed to EDA and EDC - as primary obligor, not merely as surety - the full and timely performance by Leidos of the Ammonia and OSBL EPC Contracts. Accordingly, both Leidos and Guarantor are jointly and severally liable for the

2

losses that EDA and EDC incurred as a result of Leidos' multiple failures to fully and timely perform contractual and legal obligations owed to EDA and EDC arising under the Ammonia and OSBL EPC Contracts and other tortious conduct.

## II.
## PARTIES

6.     EDA is limited liability company organized under the laws of the State of Oklahoma and authorized to conduct business in Arkansas.

7.     EDC is a corporation organized under the laws of the State of Oklahoma and authorized to conduct business in Arkansas.

8.     Defendant Leidos, now known as Benham Constructors, L.L.C. ("Benham"), is a limited liability company organized under the laws of the State of Oklahoma, authorized to do business in Arkansas, which has undergone a series of name changes in recent years. On May 6, 2011, its name was changed to SAIC Constructors, L.L.C. On September 19, 2013, its name was changed to Leidos Constructors, L.L.C. On April 18, 2016, its name was changed back to Benham Constructors, L.L.C. Benham may be served with service of process upon its registered agent in the State of Arkansas, Cogeny Global, Inc., 1215 Twin Lakes Drive, Little Rock, Arkansas 72205.

9.     Defendant Leidos Engineering LLC is a limited liability company organized under the laws of the State of Delaware. Leidos Engineering is subject to the "long arm" jurisdiction of the State of Arkansas, however, and may be served by service of process upon its registered agent in the State of Arkansas, the Corporation Company, 124 West Capitol Ave., Suite 1900, Little Rock, Arkansas, 72201.

10.    The Leidos Guarantor is a Delaware corporation authorized to do business in Arkansas and may be served with process with service upon its registered agent in the State of

3

Arkansas, the Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

## III.
## JURISDICTION AND VENUE

11.     This Court has jurisdiction over these matters in dispute pursuant to ARKANSAS CODE ANN. §16-13-201.

12.     Venue is proper in Union County, Arkansas, under ARKANSAS CODE ANN. §16-55-213, which provides that all civil actions must be brought in the county in which a substantial part of all events or omissions giving rise to the claim occurred. This civil action involves a construction project located in Union County, Arkansas. Thus, a substantial part of all events or omissions giving rise to EDA's and EDC's claims occurred in Union County.

13.     Venue is also proper in Union County, Arkansas, pursuant to the binding contractual agreements between the parties. Article 25.4 of the Ammonia EPC Contract between EDA and Leidos provides that "[a]ny and all disputes arising from or out of this Agreement and/or the Project shall be resolved in a federal or state court of competent jurisdiction in Union County, Arkansas." Article 25.4 of the OSBL EPC Contract between EDC and Leidos sets forth the same venue requirement. The Engineering Purchase Order does not set forth any mandatory venue requirements, which makes venue in Union County, Arkansas, proper under ARKANSAS CODE ANN. §16-55-213.

## IV.
## FACTUAL BACKGROUND

### A.     *Background of the Project.*

14.     The EDC nitric acid facilities in El Dorado, Arkansas (the "El Dorado Facility"), which have been in operation for years, had experienced historical poor profit margins due to the

4

continuing need to purchase ammonia from third parties on the open market subject to unpredictable fluctuations in price and supply. Beginning in 2012, EDC and its parent company, LSB Industries, Inc. ("LSB") started to explore cost-effective ways to build an ammonia plant at the El Dorado Facility in consultation with Leidos Engineering. This included a trip to Romania by LSB and Leidos personnel to inspect an ammonia plant and a dual pressure nitric acid plant.

15:     EDC and LSB also learned that an existing ammonia plant, designed by Kellogg Brown & Root, LLC ("Kellogg") in Donaldsonville, Louisiana, had become available for purchase. The owner of the Kellogg Plant had already started disassembling the plant. After Leidos Engineering determined that this plant would be suitable for service at a new location and could be put into operation sooner than a newly-designed plant, a decision was made to purchase this existing ammonia plant together with its Kellogg design engineering plans, plot plans, and piping isometrics. These components were to be used, in part, in the reconstruction of EDA's "new" ammonia plant in El Dorado.

16.     On October 3, 2012, Leidos Engineering contractually assumed responsibility for the continued disassembly of usable process equipment, structural steel, piping, insulation, and other usable material at Donaldsonville and the transportation of this material to the El Dorado Facility. Leidos Engineering's agreed scope of work included: (1) providing piping cut locations for the continued disassembly of the existing ammonia plant; (2) labeling the equipment and material and creating a database for identification of the piping and materials; (3) determining which material and components would not be relocated due to corrosion and other issues; (4) providing a detailed plan for the unloading and staging at designated lay down area; and (5) providing supervision and oversight for demolition and disposal of remaining equipment to be removed from Donaldsonville site.

17.    Leidos Engineering conducted a preliminary review of the equipment and materials at Donaldsonville. This included 100 percent of the large diameter piping. A number of pieces of equipment were determined unusable. The equipment and material from Donaldsonville determined by Leidos Engineering to be usable for construction of EDC's new ammonia plant was brought by truck and rail to the construction site in El Dorado and laid out per Leidos Engineering's plan.

18.    The process of disassembling and transporting the equipment and material from the Donaldsonville site to the El Dorado project site was completed on or about July 31, 2013.

**B.    Ammonia Plant Project with OSBL Work.**

19.    On August 12, 2013, EDA and Leidos entered into the Ammonia EPC Contract. Leidos agreed to engineer and reconstruct an ammonia plant for EDA (hereinafter, the "Project") using the equipment and material transported to El Dorado under the direction and design of Leidos Engineering together with the new equipment and new material that would need to be designed and constructed to complete the Project. The Ammonia EPC Contract provided that: (1) a fixed price of $16,649,631 would be paid for engineering (with a credit for amounts previously paid to Leidos Engineering) and general conditions; and (2) Leidos would invoice variable construction costs at actual cost plus a 4.5% fee.

20.    The engineering work previously performed by Leidos Engineering was incorporated into the Ammonia EPC Contract, and Leidos Engineering continued to serve as the Project engineer for the Project as an affiliate subcontractor of Leidos.

21.    On September 30, 2013, EDA and Leidos Engineering entered into a separate Engineering Purchase Order for the engineering services set forth in Exhibit B of the Ammonia EPC Contract for the same fixed price of $16,649,631. Thereafter, EDA and Leidos Engineering

6

had a direct contractual relationship with respect to the engineering services that Leidos Engineering performed, but the scope of the engineering duties required to be performed for the Project remained unchanged.

22.     As the EPC contractor for the Project, Leidos was responsible for:

The . . . construction, subcontractor and equipment procurement, cost controls and accounting, scheduling, estimating, invoicing, mechanical integrity, construction inspections, commissioning and start up support, and final documentation necessary to reassemble the ammonia plant at the site and the OSBL systems.

The scope of Leidos's work further included "all supervision, labor, materials, tools, equipment, supplies and services necessary to engineer and construct the Project" and "the installation by EPC Contractor [Leidos] of Owner-Furnished Equipment into a fully integrated and functioning Project."[1]

23.     Leidos Engineering was responsible for the design of the Project. This included drawings and construction documentation, including plans and specifications setting forth in detail the design aspect of the project. Both Leidos and Leidos Engineering agreed to perform their work as appropriate to complete work in accordance with the estimated contract price and the project schedule.

24.     On December 31, 2013, Leidos entered into the OSBL EPC Contract with EDC for "outside battery limits" work. The scope of work for the OSBL EPC Contract covered the engineering, procurement and construction of equipment and piping needed in the outside battery limits to supply utilities and product transfers between the new ammonia plant and the existing plant units. The OSBL scope of work also included upgrades to existing utility systems, replacement of water systems, and a new control room building. The OSBL EPC Contract provided a fixed price of $10,724,259 for engineering work (with a credit for amounts

---

[1]     The Owner-Furnished equipment consisted of major items of equipment moved from Donaldsonville, Louisiana, identified in Ammonia EPC Contract.

previously paid) and general conditions, and Leidos was to invoice variable construction costs at actual cost plus a 4.5% fee.

25.     Both the Ammonia EPC Contract and the OSBL EPC Contract included a Guaranty Agreement in which the Leidos Guarantor agreed to be held financially responsible for any and all breaches of the Ammonia EPC Contract and/or the OSBL EPC Contract.  The Guaranty Agreement expressly provides that the Guarantor:

> as primary obligor and not merely as surety, hereby unconditionally, absolutely, and irrevocably guarantees to [EDA and EDC respectively] all obligations of [Leidos] under the [Ammonia EPC Contracts], including the full and timely performance to [EDA and EDC respectively] under the Contract[s] (the "Guaranteed Performance").

Thus, the Leidos Guarantor agreed to be held jointly and severally liable for any and all failures of Leidos to fulfill the contractual obligations owed to EDA under the Ammonia EPC Contract and to EDC under the OSBL EPC Contract.

## C.     *Breaches of contractual duties owed to EDA by Leidos and Leidos Engineering.*

26.     Under the terms and conditions of the Ammonia EPC Contract, Leidos agreed to manage the Project to avoid cost overruns and delays by maintaining appropriate control of the Contract Price and the Contract Schedule.  This did not happen.

27.     Leidos' failure to comply with the Ammonia EPC Contract not only breached contractual obligations owed to EDA (which caused delays and cost overruns to the Project as a whole, despite EDA receiving ongoing assurances from Leidos), but also caused, or contributed to cause, its subcontractors to fail to perform their work in a timely manner in compliance with the Project documentation.   Not only did Leidos have contractual obligations to manage its subcontractors to ensure that work was performed in an efficient and timely manner, but Leidos was also responsible for all acts and omissions of its subcontractors.

8

**1. Leidos Engineering failed to properly and timely design the Project.**

28. The piping and mechanical work in constructing the ammonia plant was a key component of both the Engineering Purchase Order and the Ammonia EPC Contract, and this work was on the critical path to completion of the Project for most, if not all, of the relevant time period. Completion of the piping engineering work was necessary to the piping subcontractor procurement process and to the timely performance of the piping subcontractor's work. The Ammonia EPC schedule required all piping engineering to be completed by Leidos Engineering by July 2014. Later, EDA learned that Leidos Engineering not only failed to meet this deadline, but it continued to sporadically issue piping isometrics and revisions well into 2016. Moreover, EDA would later learn that a significant number of additional man-hours of work performed by subcontractors were caused by Leidos Engineering's continuing engineering errors.

29. The Engineering Purchase Order expressly stated that: (1) time was of the essence in the performance of engineering work for the Project; (2) Leidos Engineering warranted that its engineering work was free of defects; and (3) its engineering work complied with nationally recognized codes and established industry standards.

30. Because Leidos Engineering failed to complete the piping engineering work in accordance with the Project schedule, the subcontractor procurement process was delayed. Leidos did not issue its invitation to bid to prospective piping and mechanical contractors until on or about July 25, 2014. Leidos continued to tell LSB that the Project remained on schedule. This work was competitively bid, and a number of bids were received.

31. On September 4, 2014, Leidos advised EDA that that it had decided to award this subcontract to Global Industrial Contractors, Inc. ("Global"). Leidos chose to contract with Global on a time and materials ("T&M") basis for $22,545,504 instead of accepting Global's lump sum bid to perform the piping and mechanical work at the ammonia plant for $23,594,217.

Leidos's choice of a time and materials subcontract with Global allowed it to simply pass on Global's invoices to EDA for payment with an added 4.5% contractor fee, which provided little or no incentive to Leidos to keep Global productive or efficient in its use of time and materials.

32. The piping and mechanical work made the subject matter of Global's subcontract with Leidos include 75% installation work involving ammonia unit pipe lines from Donaldsonville plant and 25% installation of new pipe lines to be designed by Leidos. The agreed Project schedule required Leidos Engineering to complete design work and engineering prior to the start of piping installation. However, unbeknownst to EDA, when Global's subcontract was signed on October 17, 2014, less than half of necessary engineering design of new piping work had been issued for construction by Leidos Engineering. Leidos promised Global that all engineering on the ammonia plant project would be completed by December 31, 2014, but this did not happen. In fact, EDA would later learn that most of the piping isometrics had still not been issued by February 2015.

33. Because of Leidos Engineering's delays, actual piping installation work did not begin on the Project until on or about November 17, 2014. This ultimately resulted in an inexcusable delay of the Project, despite EDA receiving ongoing assurances from Leidos. In addition, engineering delays (including delayed production of necessary drawings, engineering mistakes/corrections, and repeated revisions to drawings) continued thereafter, which continued to delay piping installation work. Even after piping installation had begun, Global continued to lack complete and/or updated piping isometrics. Leidos Engineering was fully aware that piping installation would take over the critical path through completion of the Project, yet it erroneously claimed that its delayed piping engineering work would not be on the critical path of project completion so long as its engineering work remained "ahead" of work being performed by

10

Global. At all times relevant herein, Leidos Engineering wholly disregarded, and failed to remedy, the impact that its repeatedly delayed and defective engineering work had on the mechanical and piping completion of the Project, while continuing to assure EDA that any potential delays could be mitigated.

34. The delayed and defective engineering work at the start of the Project, the full extent of which was not known to EDA, prevented Global from being fully productive at the start of its work. These early delays in piping installation could not be effectively remedied by additional shifts and more manpower later in the Project schedule, despite Leidos' representations to the contrary. Leidos apparently felt that adding more and more manpower to the piping installation work could make up the time lost in delayed engineering work, but in fact, the added manpower created an inefficient and overly crowded work site. This inevitably resulted in increased loss of productivity by Global and unnecessarily increased costs to EDA.

35. Global claims that the "lack of engineering" was its biggest challenge on the Project and that Leidos Engineering appeared to have difficulty generating accurate engineering necessary to complete the project. According to Global, the engineering provided by Leidos was often inaccurate or incomplete, and this impeded the progress of piping installation. In fact, EDA later learned that Global's termination for convenience by Leidos in early July 2015 was motivated in part to allow Leidos Engineering additional time to complete its piping engineering work.

**2.    Leidos failed to perform the necessary preparation of the designated laydown areas, storage areas or areas needed for access of materials and equipment.**

36. Leidos Engineering's mistakes in disassembling and transporting equipment and material from Donaldsonville to the project site created additional delays and problems for which Leidos became responsible as EPC contractor for the Project. The disassembly, marking,

11

shipment, and lay out of transported equipment and material at the Project site was haphazard. EDA later learned that there were pieces of disassembled equipment and material scattered throughout the site without any significant organization, and the time spent searching for material impeded the progress of Global's work. Further, EDA later learned that Leidos Engineering failed to properly mark each end of each piece of disassembled pipe to provide a reference for reassembly, which further impeded the progress of its work. Such mismanagement of the designated laydown areas needed for access to materials and equipment constitute an additional breach of Leidos's contractual obligations.

37.     Leidos was also responsible for the management of materials needed for the Project. In particular, Leidos was required to perform all necessary preparation for laydown areas, storage areas, and areas needed for access of materials and equipment. While Global performed work on the Project, materials were spread across six different laydown yards, which made it difficult and time consuming to identify required materials and deliver proper materials for installation. Leidos was either directly responsible or inexcusably negligent in tolerating such obvious inefficiencies in material handling at the Project site, but once again, it continued to reassure LSB that the Project remained on schedule.

**3.     Leidos failed to inspect subcontractor work and adequately supervise subcontractors.**

38.     After Global was terminated by Leidos for convenience on or about July 2, 2015, a dispute arose over amounts owed to Global for its work. Rework of defective piping installed by Global was belatedly discovered by Leidos and required correction. The fact that Leidos had not previously detected such defective work while Global's work was being performed evidences Leidos's failure to adequately supervise Global and evidences the failure of Leidos to inspect work and perform quality control inspections in a timely manner. The inexcusable delay in

detecting such defective piping work caused EDA to incur additional costs and expenses that would not have been incurred had Leidos performed its contractual obligations properly and in a timely manner.

39.     Leidos imposed a sizeable back charge against amounts otherwise owed to Global as a result of costs incurred because of Global's non-conforming work, which had to be remediated and, in many cases, replaced altogether. Significantly, Global disputes many of the back charges on the basis that its non-conforming work was allegedly performed in accordance with the engineering information provided at the time by Leidos. Global also contends that many of the charges included in Leidos's calculation of the back charge amount are simply fraudulent.

40.     Leidos' mismanagement of Global, (including failure to provide Global with accurate and timely engineering information and suitable materials) and its failure to timely inspect Global's work caused significant cost increases to the Project with resulting injury and damage to EDA.

**4.     Leidos failed to perform the work necessary to complete the Project in accordance with the Estimated Contract Price.**

41.     Leidos' mismanagement of the Project caused substantial cost overruns far in excess of their own Estimated Contract Price. Leidos' failure to keep Project costs within the Estimated Contract Price did not become apparent until late in the Project, however, as Leidos' reports to EDA had falsely represented that the percentage of Contract Price expended conformed to the percentage of Project completion. Only after a third party hired by EDA, using measureable data instead of expenditures, determined that Project completion lagged far behind Project expenditures did Leidos misrepresentations concerning the status of Project completion come to light. In short, Leidos utterly failed to perform the work necessary to complete the Project in accordance with the estimated contract price.

42.     Inasmuch as Leidos' profit increased as the Project costs increased, Leidos' failure to manage to costs of the Project was self-serving.  The greater the cost overrun and injury to EDA, the greater Leidos' profit.

### 5.     Leidos failed to perform the work necessary to complete the Project in accordance with the Project Schedule.

43.     As a direct result of Leidos' and Leidos Engineering's breaches of their contractual duties, mechanical completion of the Project was significantly delayed.  The Project schedule was revised multiple times during the course of the Project.  This was due to repeated failures to complete design work and construction work in accordance with the existing Project Schedule, despite continued assurances to EDA.  Accordingly, both Leidos and Leidos Engineering were responsible for substantial delays in completing the Project.

44.     The Ammonia EPC Contract contemplated completion of the Project by September 1, 2015.  As a result of delays caused largely by Leidos and Leidos Engineering, mechanical completion of the Project did not occur until February 16, 2016.

45.     The Ammonia EPC Contract provides for liquidated damages of $5,000 per day for each full day of delay if mechanical completion was not achieved by the agreed completion date due to Leidos's failure to prosecute the work with diligence and/or its negligence or the negligence of its subcontractors.  Given the substantial delay caused by Leidos, Leidos is liable for these liquidated damages.

46.     The Engineering Purchase Order has no provision for liquidated damages for delay, but Leidos Engineering remains liable for all damages caused by its delays to the Project in an amount to be proven at time of trial.

47.     EDA incurred additional costs when forced to transfer the scheduling responsibilities for the Project from Leidos to another engineering firm, Hatch, Ltd. ("Hatch").

As set forth above, the Ammonia EPC Contract required Leidos to provide sufficient management of the work to achieve Project completion in accordance with the estimated contract price and the agreed Project schedule. By May 2015, Leidos had failed to manage and adequately supervise its subcontractors (Global in particular) and had repeatedly caused the Project schedule to slip, leaving EDA with no alternative but to transfer the scheduling responsibility for the Project to Hatch.

48. EDA retained the services of a replacement engineering firm to take over scheduling responsibilities for the Project that Leidos and/or Leidos Engineering proved unable to adequately perform. These were duplicative costs incurred by EDA, as such services were part of Leidos's scope of work under the Ammonia EPC Contract. Accordingly, EDA is entitled to recover these additional costs from Leidos.

**6. Leidos failed to be fully responsible for the work of its subcontractors.**

49. After the fact, Leidos has admitted that Global's work on the Project was not adequate, conforming, or timely. According to Leidos, this is why Leidos removed Global from the Project and terminated it contract on or about July 2, 2015.

50. The fact that Leidos was purportedly unaware of the full extent of Global's deficient performance of its work until after Global's termination amply demonstrates the inadequacies of Leidos's management of the Project. It also shows Leidos' failure to provide adequate quality control of subcontractor work and to adequately inspect the work of its subcontractors. Leidos was demonstrably unable to manage or prevent Global's inadequate performance of its contractual obligations, its non-conforming work, and its ever-increasing delays to the Project schedule.

51. In order to repair Global's defective work, pass the appropriate inspection tests, and complete the appropriate quality control documentation, Leidos claims that ten categories of

direct and indirect costs and delay and project impact costs arising from Global's defective work total $9,977,357, which it assessed as a back charge to Global. All such costs represent costs that EDA is entitled to recover from Leidos as a result of its subcontractor's defective work..

52.     Although Leidos agreed in the Ammonia EPC Contract to be held responsible for the work of its subcontractors, when Global and other of its subcontractors unquestionably failed to perform their work in compliance with contractual obligations, Leidos refused to accept responsibility for such failures and, thereby, committed its own breaches of the Ammonia EPC Contract.

### .7.     Leidos failed to properly review and process applications for payment submitted by its subcontractors and suppliers and failed to pay its subcontractors and suppliers.

53.     Leidos' failure to properly review and process applications for payment submitted by its subcontractors and vendors constituted further dereliction of contractual duties owed to EDA and caused additional cost overruns to the Project. This failure resulted in inflated costs for EDA.

#### a.     Invalid and unsubstantiated change orders.

54.     B&H Contractors of South Dakota ("B&H") was a subcontractor of Leidos, which entered into a lump sum subcontract on November 8, 2013 to perform concrete civil work, and steel erection work, for the Project for a fixed price of $2,985,480. Over the course of the Project, B&H submitted 30 change orders of which 18 were for time and materials to increase the "not to exceed" amounts set by the subcontract. EDA later learned that not only did Leidos fail to manage B&H in order to finish its work in a timely and cost effective manner, but Leidos allowed B&H to submit change orders without a defined scope of work and the backup necessary to audit the work performed. EDA is, accordingly, entitled to recover from Leidos for

16

the amounts charged for time and materials by B&H under invalid and unsubstantiated change orders.

### b. Inefficient and non-productive overtime.

55.    Leidos's failure to properly review payment applications is also evident in the inefficient and non-productive overtime invoiced by its subcontractors. For example, due to the initial delays in the piping installation work, Global was allowed to amend its work schedule to six days per week and twelve hours per day. EDA agreed to this change on the basis of representations made by Leidos's project manager that Global's revised work schedule was not expected to have any cost implications for EDA. Leidos agreed to manage Global to ensure that Global did not abuse the new work schedule by charging excessive overtime hours with little or no productivity resulting from the extra hours. Instead, unbeknownst to EDA, Leidos allowed Global to use the revised work schedule as a blank check to be written on EDA's account.

56.    Global's poor performance and inefficiencies were allowed to continue for months due to Leidos's negligent management and lack of oversight of payment applications by Leidos. Global billed over 70,000 overtime hours between March 1, 2015 and its termination date of July 2, 2015. Most of this overtime was grossly inefficient, and EDA is entitled to be reimbursed for all of Global's inefficient overtime work.

### c. Subcontractor overbillings revealed by badge stamp data.

57.    Security badges were issued to the employees of Leidos's subcontractors, and these badges were scanned at security stations upon entry and exit of the facility. The badge stamp data recorded the contractor, work date, time the badge was used for the first and last time on a given date, the number of times the badge was used in a day, and the duration between the

17

first and last reads of the badge (the maximum amount of time an employee spent on the Project site in a given day).

58.     Subcontractor invoices, on the other hand, were prepared using daily timesheets. When the hours shown on daily timesheets used to support subcontractor invoices were compared to the duration per day recorded by the badge stamp system, significant discrepancies were discovered. When the badge stamp data showed a person was at the Project site for less time than indicated on a daily timesheets prepared to support an invoice, the difference constitutes overbilling. Since the duration period does not subtract time spent away from the Project site during the day before final departure (lunch and breaks), the calculated overbilling is generally understated.

59.     A review of 65,000 invoiced labor hours by three subcontractors, Performance, B&H and Milam Construction Co., when compared to badge stamp data, showed 2,879 overbilled hours. EDA is entitled to reimbursement for this overbilling.

**8.      Leidos failed to maintain a competent full-time staff at the Project Site.**

60.     At all times relevant herein, Leidos failed to maintain a competent full-time staff at the Project site. Instead, the Leidos personnel who were assigned duties to manage and supervise the Project were also obligated to concurrently manage and supervise three other large projects in El Dorado: the OSBL Project, the weak nitric acid plant project, and the concentrated nitric acid plant project. Leidos' management of the Project was performed on a part-time basis by its staff, which was never able to give their undivided attention to the Project. This situation inevitably caused delays and failures to meet the Project Schedule, mistakes and defective engineering, inadequate inspections of performed work, inadequate supervision of subcontractors, and the

18

multitude of other problems caused by Leidos' failure to meet its obligations as EPC contractor for the Project, while continuing to provide EDA with assurances about the Project.

61.     Leidos' failure to maintain a competent full-time staff at the Project site also caused and contributed to cause significant cost overruns to be incurred by EDA. It also resulted in Hatch being hired to supply the people to keep the Project moving forward.

62.     EDA is entitled to recover its damages for this additional breach of contractual obligations owed to EDA.

9.     **Leidos failed to secure, monitor and coordinate the activity of its subcontractors to complete the Work in a coordinated, integrated and functional manner.**

63.     As the Project Schedule fell further and further behind, Leidos' construction management deteriorated further:  Operating under a false belief that its own deficiencies in Project management could be overcome by pouring more and more subcontractors into the Project site and by requiring subcontractors to work around the clock, Leidos caused overcrowding of work sites, disruption of subcontractor plans, interference between and among subcontractors, and gross inefficiencies in subcontractor performance of work at the Project site. Meanwhile, Leidos continued to inform EDA that these steps were being taken to mitigate any potential delay.

64.     Leidos' abject failure to coordinate the activity of its subcontractors to complete the Project work in a coordinated, integrated, and functional manner caused costs to dramatically increase, which was coupled with a loss of productivity among such subcontractors.  All such costs incurred were a direct result of Leidos's breaches of contractual duties owed to EDA.

10.     **Leidos failed to keep EDA informed of the procedures, sequencing, progress, problems and scheduling of the Project.**

65.     Following the execution of the Ammonia EPC Contract, EDA justifiably relied

upon monthly progress reports from Leidos. These monthly progress reports appeared to be detailed analyses of construction progress and purported to provide EDA with all relevant information about conditions at the project site. Given Leidos' role as the EPC Contractor, it was reasonable for EDA to assume that these monthly reports provided an accurate picture of the construction on the Project.

66.     In fact, these monthly reports failed to disclose serious problems that Leidos knew, or should have known, existed at the Project site that would cause substantial delay and cost overruns. For example, these monthly reports contained a series of fraudulent misrepresentations by Leidos that the Project remained on schedule and that work was progressing according to schedule. In fact, the Project was far behind schedule and work had not progressed to the extent described in the monthly reports.

### 11.    Leidos failed to enforce reasonable discipline and good order among its subcontractors' employees.

67.     Leidos failed to enforce reasonable discipline and good order among its subcontractors' employees. The subcontractor employees of Leidos had to be repeatedly evicted from the Project for brawling, drug offenses, and other egregious behavior. The records of employee incidents demonstrate the disorder and chaos that Leidos allowed to continue at the Project site with little or no demonstrable supervision or management of subcontractor employees.

### 12.    Leidos failed to correct the non-conforming work of its subcontractors at no cost to EDA.

68.     As set forth above, Leidos's failure to properly inspect and supervise the work of its subcontractors as the work was being performed was not immediately known to EDA, but resulted in defects and failures of such work to meet contract requirements. Moreover, many of the defects in the work and failures on the part of the Leidos subcontractors were the direct result

of defects in Leidos's own engineering work. Whether such non-conforming work was caused by Leidos's subcontractors or its own engineering deficiencies is irrelevant. Leidos was contractually obligated to correct all such defective work at no cost to EDA.

69.    Leidos did not properly correct this defective work in compliance with its obligations under the Ammonia EPC Contract. Instead, Leidos simply passed the additional cost of correcting defective work as additional time and materials work performed by its subcontractors, together with its 4.5% fee as additional costs to be paid by EDA, or forced EDA to directly pay for correcting defective work at its own cost.

### 13.    Leidos failed to retain high quality, competent and qualified subcontractors, capable of performing the work necessary for the Project.

70.    Leidos failed to retain competent and qualified subcontractors capable of performing the work necessary for the Project. While EDA reserved the right to reject any unsatisfactory Subcontractor, this did not relieve or release Leidos from full responsibility for the adequate, conforming and timely performance of the Work. Leidos remained solely responsible for ensuring that all Subcontractors were qualified to perform their work on time and in accordance with the plans and specifications, as was being represented to EDA.

71.    As the owner of the Project site where Global was working (under insufficient supervision and management by Leidos), EDA experienced its own problems with Leidos's subcontractors, which ranged from OSHA violations to criminal conduct. During a significant portion of the work on the Project, Leidos made little or no effort to ensure that work on the Project was performed by first rate, competent, and qualified subcontractors.

### 14.    Leidos failed to perform warranty work.

72.    EDA warranty issues remain unresolved. These warranty claims include both design and construction issues constituting defective work. EDA has submitted these warranty

21

claims to Leidos, and Leidos has thus far failed to fulfill its warranty obligations by correcting its defective work.

### 15. Leidos failed to make EDA a third-party beneficiary to Global's subcontract.

73. The EPC Contract between EDA and Leidos expressly required subcontracts between Leidos and its subcontractors to contain provisions that established EDA as an intended third-party beneficiary. Notwithstanding this requirement, Leidos failed to comply with this clear contractual obligation in its subcontracts with Global. In fact, all four Global subcontracts expressly exclude EDA as an intended third-party beneficiary of the subcontracts.

74. Leidos' failure to make EDA a third party beneficiary of its subcontract with Global - in direct violation of its own obligations to EDA under the Ammonia EPC Contract - has deprived EDA of rights and remedies to which it would otherwise be entitled as a defendant in the lawsuit filed by Global (*see infra*) and caused substantial economic injury to EDA for which it is entitled to recover.

### D. Negligence, professional negligence, and gross negligence.

75. The breaches of professional duties owed to EDA and EDC by Leidos Engineering as the design engineers of the Project constitute negligence and gross negligence on the part of Leidos. The engineering work of Leidos Engineering failed to meet established industry standards and was repeatedly late, out of sequence, and rife with defects. The negligence, professional negligence, and gross negligence displayed by Leidos Engineering include:

- Mistakes in, and excessive revisions to, construction drawings;

- The failure to recognize the need to revise the original Kellogg drawings until late in the Project;

22

- P&ID drawings (piping and instrumentation conceptual diagrams) that had not been completed until the late stages of the Project;

- The failure to provide engineering drawings in timely manner to subcontractors; and

- The failure to issue construction drawings in a logical sequence.

76.    Leidos Engineering's defective drawings repeatedly caused mistakes to be made by subcontractors. This in turn resulted in non-conforming work. This non-conforming work was subsequently corrected with revised engineering drawings at additional cost to EDA. This caused repeated delays to the Project, but EDA continued to receive ongoing assurances from Leidos regarding the overall Project schedule.

77.    Leidos Engineering's negligence, professional negligence, and gross negligence also includes its failure to determine the reliability of the original drawings of the Donaldsonville ammonia plant before incorporating such drawings into its own engineering work on the Project.

E.    *Fraud and constructive fraud.*

78.    Leidos submitted false and misleading information to EDA. As the EPC contractor, Leidos had the responsibility of providing accurate Project information to EDA. EDA necessarily relied upon the information that Leidos provided because of Leidos' status as the EPC contractor.

79.    Leidos' false statements typically came in the form of monthly reports which were supposed to accurately depict progress on the Project. While the early monthly reports may have been accurate in their summary of the progress on the Project, Leidos soon began submitting fraudulent monthly reports that contained grossly inaccurate information about the Project. These fraudulent monthly reports: (1) failed to disclose Leidos Engineering's failure to timely complete the engineering drawings; (2) failed to disclose Leidos' inability to provide Global with adequate

direction; (3) used an inaccurate and misleading metric to report Project Completion; and (4)

falsely depicted the Project as progressing according to schedule and EDA's expectations.

There were other false and misleading statements by Leidos:

- Leidos and Leidos Engineering falsely represented to EDA that completion of engineering drawings had been accomplished in April 2015 when, in fact, isometric drawings needed by subcontractors had not yet been completed. At the time the representation was made, Leidos Engineering's isometric drawings were in fact substantially delayed and far behind the Project Schedule.

- EDA was persuaded by Leidos' representations that the Project schedule could be advanced (and delays caused by Leidos' late engineering specifications could be overcome) if Global could hire more welders at a higher rate of pay and be allowed to operate double shifts of work (*see supra*). EDA relied upon Leidos' representations when agreeing to this change. Although EDA agreed to issue Leidos the requested change order, Global's productivity actually *decreased* after these changes were made. Because Leidos' delayed and defective engineering work was not disclosed or remedied by this change order, the result was another large increase in Project cost incurred by EDA as a result of Leidos' effort to conceal its own failures.

80.    In each case, false representations about the work were made by Leidos to EDA

with either knowledge of the falsity or with reckless disregard for the truth. Leidos' fraudulent

statements were intended to deceive EDA into taking actions that it would not have otherwise

taken had true facts about the work in progress been disclosed. Namely, the continued use of

Leidos and Leidos Engineering on the Project.

81.    EDA's reliance upon information provided by Leidos was reasonable. Again,

Leidos was the EPC contractor on the Project and in the best position to report on its status.

Consistent with construction practice, EDA relied upon its EPC contractor to provide accurate

Project information.

82.    It was only after another engineering firm was retained to begin undertaking

necessary pre-commissioning activities for the Project that the falsity of Leidos' monthly reports

24

was slowly revealed. Once objective measurements of progress at the Project were implemented by Hatch, Leidos' monthly reports appeared to have been false, misleading, and completely self-serving.

83.    EDA suffered actual loss as a result of the material misrepresentations made to it by Leidos. This includes: (1) the fees that EDA continued to pay Leidos; (2) the inefficient overtime paid to Global; and (3) other construction costs that EDA incurred as a result of its reliance on Leidos' fraudulent statements.

## V.
## ADDITIONAL DAMAGES

84.    Defendants' wrongful acts and omissions, set forth above, are responsible for the following additional costs incurred by EDA.

### A.    *Delay damages.*

85.    Leidos and the Leidos Guarantor are responsible for liquidated damages under the EPC Contract. Leidos caused critical path delay through its failure to timely complete its engineering drawings and general mismanagement of the Project. Leidos Engineering is responsible for delay damages for its failure to timely perform under the Engineering Purchase Order. Leidos Engineering caused critical path delay through its failure to timely complete its engineering drawings.

### B.    *Overpayment to Leidos.*

86.    There were substantial overpayments to Leidos that EDA seeks to recover. These overpayment amounts are not the actual measure of EDA's damages. Instead, they are a part of EDA's damages. A preliminary review shows that the total of these costs is over $35 million. Both Leidos and the Leidos Guarantor are liable for all overpayments made to Leidos.

87.    These overpayments have been categorized and identified as follows:

25

### 1,    Overpayments to Global.

88.    As set forth above, Leidos had a contractual obligation: (1) to supervise, manage, and inspect work performed by Global for compliance with plans and specifications, and (2) to assume full responsibility for the negligent acts and omissions of Global. Leidos failed to comply with these duties, and as a result, EDA incurred excessive costs for Global's defective and inefficient work.

### 2.    Additional costs due to negligent materials management and supervision.

89.    Leidos is also responsible for other costs attributable to its negligent materials management and supervision. These failures on the part of Leidos directly impacted the productivity of Global. When appropriate methodology based on industry standards is applied to include both mismanagement of materials and negligent supervision of a subcontractor, over 38,000 man hours billed by Global was wasted time.

### 3.    Transition costs following Global's termination.

90.    The effective date of Global's termination was July 2, 2015, which left the Project site without a piping subcontractor for approximately one month. During that period of time, EDA incurred additional costs and sustained further delay to the Project as transitional tasks had to be performed before a replacement subcontractor was hired to complete the piping work (and to remedy defective piping work performed by Global). These transitional tasks included inter alia identification the scope of work remaining to be completed, developing a more effective management of the materials on site, determining staffing needed to complete the work, and to calculate costs to complete the work.

### 4.    Additional costs paid to replacement piping contractor caused by Leidos Engineering's errors and mismanagement.

91.    The replacement piping contractor, Performance, entered into a contract with

26

EDA to complete Global's work. As reflected in Performance's invoices, a significant number of man-hours of work performed by Performance were caused by Leidos Engineering's continuing engineering errors and Leidos' mismanagement of construction activity at the Project site. This includes additional work caused by Leidos Engineering's engineering revisions and existing isometric errors. It also includes time caused by Leidos' failure to manage its subcontractors. Altogether, over 18,000 additional man-hours of work resulted from impacts caused by Defendants' engineering errors and mismanagement.

### 5. Invalid and unsubstantiated change orders submitted by subcontractor B&H Contractors.

92. EDA seeks recovery for the amounts charged for time and materials by B&H under 17 invalid and unsubstantiated change orders.

### 6. Additional costs caused by 78 calendar day delay after Leidos' termination of Global for convenience.

93. As set forth above, after terminating Global, Leidos delayed completion of the piping installation due to engineering revisions, existing isometric errors, Global-related back charges, and contractor interference, while continuing to provide assurances to EDA. Because of these delays and associated impacts, Performance incurred additional indirect labor costs.

### 7. Additional costs incurred with overtime inefficiencies to mitigate 195 calendar day delay.

94. By the time Leidos terminated Global, a delay of 195 calendar days had already occurred (*supra*). Consequently, replacement and downstream subcontractors (*e.g.*, insulation and painting) were required to work overtime to overcome the 195 day delay and mitigate the impending cost overruns. At least three subcontractors (Performance, ParFab Industries, Inc. and Mobley Industrial Services) were put in the position of working inefficiently as a result of excessive overtime being scheduled to complete their individual scopes of work.

### 8. MMR delay and inefficiency costs.

95.     MMR Group, Inc. ("MMR") was a subcontractor of Leidos that performed the electrical and instrumentation and control work on the Project. Although the subcontract was originally priced as a lump sum contract, starting in May 2015, MMR submitted change orders that increased its contract price for delays and inefficiencies experienced at the Project site. Because MMR's work was dependent upon Global's completion of its piping installation work, MMR experienced delays and inefficiencies as a result of Global's poor performance. Thereafter, MMR was forced to work inefficiently to attempt to mitigate the delays that occurred during piping installation.

### 9. Subcontractor overbillings revealed by badge stamp data.

96.     As set forth above, a review of invoiced labor hours by three subcontractors, Performance, B&H and Milam Construction Co., when compared to badge stamp data, showed substantial overbilled hours.

### C. Unresolved warranty claims.

97.     As set forth above, EDA has submitted warranty claims to Leidos, and Leidos failed and refused to fulfill its warranty obligations by correcting its defective work. To date EDA has expended its own funds to address the outstanding warranty items. EDA seeks reimbursement for these warranty-related costs from both Leidos and the Leidos Guarantor.

### D. Defense and indemnity against Global lawsuit owed to EDA under Article 19.1 of the Ammonia EPC Contract and under applicable Arkansas law.

98.     Additionally, Leidos is obligated to assume all costs of the defense of EDA and its affiliates in the lawsuit filed by the terminated subcontractor, Global, now pending in Union County, Arkansas, styled *Global Industrial, Inc. v. Leidos Constructors, LLC, et al.* Case No. 70-CV-2016-76-6. Global seeks to recover no less than $9,171,012.40 in payment for work

28

performed on the Project as a subcontractor of Leidos and is seeking to foreclose a lien filed against the real property of EDC. Leidos is also a defendant in Global's lawsuit.

99.     The Ammonia EPC Contract requires Leidos to indemnify EDA for the claims asserted by Global in this lawsuit. On March 16, 2016, EDA and its affiliates notified Leidos of the claims that had been asserted against EDA and demanded that Leidos indemnify and hold the Owner Indemnitees harmless from any and all claims and/or liability in the Global lawsuit.

100.     On March 22, 2016, Leidos responded by inexplicably denying any obligation or liability under the Ammonia EPC Contract to defend or indemnify EDA and its affiliates from Global's claims. Leidos's failure and refusal to perform its obligations under Article 19.1 of the EPC Contract constitutes another clear breach of its contractual obligations.

101.     EDA is also owed a defense and indemnity against the claims of Global under applicable Arkansas law. The Ammonia EPC Contract is governed by the laws of Arkansas (Article 25.4). Under applicable Arkansas law, when a lien has been filed against an owner's property, a contractor like Leidos has the duty to defend at its own expense any action brought upon the lien. ARK. CODE §18-44-124(a). In the case of judgment against the owner of the property upon the lien, the owner is entitled to recover back from the contractor any amount for which the contractor was originally liable. ARK. CODE §19-44-124(b).

102.     At this point in time, significant attorney's fees have already been incurred by EDA and affiliated companies in defending against Global's lawsuit, and litigation costs will continue to be incurred. Leidos should have assumed the costs of EDA's defense in this lawsuit long ago. EDA thus seeks complete reimbursement for all of the fees and expenses that it has incurred in defending the Global lawsuit.

## VI.
## CONDITIONS PRECEDENT TO FILING LAWSUIT HAVE BEEN MET

103.   All conditions precedent to filing this lawsuit have been met.  On April 11, 2017, EDA sent a demand letter to Leidos with notice of the claims asserted herein, which included service upon Leidos's guarantor, Leidos, Inc.  The responses EDA received from both Leidos and its guarantor constituted a refusal to meet the asserted demand.  On May 31, 2017, a notice of default was sent to Leidos, which also included service upon Leidos's guarantor, Leidos, Inc.  Leidos was given ten days to cure its defaults in accordance with Article 22 of the Ammonia EPC Contract, but the defaults were not cured.

104.   On August 24, 2017, written notice was served on the guarantor, Leidos, Inc., by a duly authorized officer of EDA pursuant to Section 2.02 of the Guaranty Agreement, which specified the failures of Leidos to fully and timely perform its contractual obligations under the Ammonia EPC Contract.

105.   On September 22, 2017, EDA sent a demand for mediation in accordance with Article 25.12 of the Ammonia EPC Contract.  EDA accepted the proposal of Leidos to use Mr. Jeffrey Paulk as mediator in Oklahoma and advised Defendants of available dates on Mr. Paulk's schedule for mediation over the next 45 days.

106.   Defendants have refused to participate in mediation or provide a written waiver of the mediation provision of the Ammonia EPC Contract.  Defendants were "unavailable" during the dates proposed by EDA, and they refused to provide any alternative dates.  Instead, Defendants attempted to impose onerous conditions on EDA that were not required to complete mediation.  Under the circumstances set forth above, Defendant's conduct constitutes a waiver of this contractual requirement.

## VII.
## CAUSES OF ACTION

### A.    *Leidos' Breach of Ammonia EPC Contract.*

107.    Paragraphs 1 through 106 are incorporated herein by reference as if fully set forth at length.

108.    Leidos breached the Ammonia EPC Contract in the following manner:

- Leidos failed to properly and timely design the Project.

- Leidos failed to perform the necessary preparation of the designated laydown areas needed for access to materials and equipment.

- Leidos failed to procure materials and equipment in conformance with Contract Documents.

- Leidos failed to perform the work necessary to complete the Project in accordance with the Estimated Contract Price.

- Leidos failed to perform the work necessary to complete the Project in accordance with the Project Schedule.

- After entering into direct contracts with subcontractors and material suppliers, Leidos contractually assumed responsibility for all defects in the Work and delays to the Project caused by its subcontractors, yet  Leidos failed and refused to be fully responsible for their work, including the timeliness, quality and price of their Work.

- Leidos failed to properly review and process applications for payment submitted by their subcontractors and suppliers and failed to pay their subcontractors and suppliers.

- Leidos failed to maintain a competent full-time staff at the Project Site, including a full time construction manager, to supervise and confirm that the Work and progress of its subcontractors was in full compliance with the plans and specifications and completion dates set forth in the EPC Contract.

- Leidos failed to perform the necessary preparation for designated laydown areas, storage areas or areas needed for access of materials and equipment.

- Leidos failed to secure, monitor and coordinate the activity of its subcontractors to complete the Work in a coordinated, integrated and functional manner.

- Leidos failed to keep EDA informed of the procedures, sequencing, progress,

31

problems and scheduling of the Project, particularly with respect to piping work, and failed to submit an accurate monthly comprehensive progress report to EDA.

- Leidos failed to enforce reasonable discipline and good order among its subcontractor employees.

- Leidos failed to correct the Work of its subcontractors which did not conform to the EPC Contract at no cost to EDA.

- Leidos failed to retain high quality, competent and qualified subcontractors, capable of performing the work necessary for the Project.

- Leidos failed to perform the commissioning included in the general conditions and engineering services fixed price.

- Leidos failed to perform warranty work.

- Leidos's failed to make EDA third-party beneficiary in Global's subcontracts.

109. As a result of Leidos's breaches of the Ammonia EPC Contract, EDA has suffered damages. EDA seeks to recover all damages caused by Leidos' breaches of the Ammonia EPC Contract in an amount to be determined at time of trial. This amount is recoverable against both Leidos and the Leidos Guarantor.

**B.   Leidos Guarantor's Breach of Guaranty Agreement.**

110. Paragraphs 1 through 109 are incorporated herein by reference as if fully set forth at length.

111. The Leidos Guarantor breached the Guaranty Agreements of the Ammonia EPC Contract by failing to unconditionally, absolutely, and irrevocably guarantee to EDA the full and timely performance of Leidos of this contract. As a result of the Leidos Guarantor's breach of the Guaranty Agreement, EDA has suffered damages. EDA seeks to recover all damages caused by such breach in an amount to be determined at time of trial.

**C.   Leidos Engineering's breach of Engineering Purchase Order.**

112. Paragraphs 1 through 111 are incorporated herein by reference as if fully set forth

32

at length.

113. As described above, Leidos Engineering breached the Engineering Purchase Order by:

- Failing to perform engineering work for the Project in a timely manner;

- Failing to perform engineering work free of defects; and

- Failing to ensure that its engineering work complied with nationally recognized codes and established industry standards.

114. As a result of Leidos Engineering's breaches of the Engineering Purchase Order, EDA has suffered the damages discussed above.

**D.** **Leidos and Leidos Engineering's negligence, professional negligence, and gross negligence.**

115. Paragraphs 1 through 114 are incorporated herein by reference as if fully set forth at length.

116. Leidos and Leidos Engineering owed a duty of care to EDA, independent of their contractual obligations under the Ammonia EPC Contract and Engineering Purchase Order, to perform their engineering work to the professional standard of engineers performing such work in similar circumstances. As discussed above, Leidos and Leidos Engineering breached their duty of care to EDA, and such breaches caused in fact and proximately caused injury and loss to EDA. Such breaches of the duty of care owed to EDA constitute negligence under applicable Arkansas law.

117. The facts above also indicate that Ledios and Leidos Engineering acted with gross negligence. Leidos and Leidos Engineering knew that the engineering drawings were on the critical path of the Project. Despite this knowledge, Leidos and Leidos Engineering put the entire Project in jeopardy by: (1) failing to timely complete its engineered drawings; (2) failing

to inform anyone about this critical delay; and (3) producing of patently false and misleading monthly reports.

118. Leidos and Leidos Engineering continued to commit gross negligence even after Global left the Project. Despite having the time to fix its engineering mistakes after Global's termination, Leidos and Leidos Engineering continued to fall behind. They also continued to keep their failures hidden from EDA. As a result, the Project experienced the same delays even after Global's termination.

119. EDA seeks to recover all damages proximately caused by all negligence and gross negligence of Leidos and Leidos Engineering in an amount to be determined at time of trial.

### E. Fraud and constructive fraud.

120. Paragraphs 1 through 119 are incorporated herein by reference as if fully set forth at length.

121. Leidos repeatedly made fraudulent misrepresentations to EDA during the course of the Project, which consisted of both false representations of facts and failures to disclose facts despite a clear duty to disclose the withheld facts. Fraudulent misrepresentations include situations where someone misstates a fact and either knows or believes that what he is saying is not true or is not sure whether or not his statement is true but passes it off as true anyway. Such misrepresentations were intended to deceive EDA into approving payments and change orders to Leidos and others that it would not have otherwise approved and/or deceiving EDA into a false belief that work was progressing in a timely manner at the Project site when in fact it was not.

122. EDA reasonably relied upon the fraudulent misrepresentations of Leidos and incurred substantial losses and damages as a result of such reliance.

## *F.*    *Claim for attorney's fees.*

123.    Paragraphs 1 through 122 are incorporated herein by reference as if fully set forth at length.

124.    Additionally, EDA and EDC are entitled to recover their reasonable attorney's fees incurred in this action. The Ammonia EPC Contract provides for the recovery of attorney's fees. Additionally, attorney's fees in this action are recoverable under Arkansas law.

## PRAYER

125.    For the reasons set forth above, EDA and EDC ask for judgment against Leidos, Leidos Engineering, and the Leidos Guarantor for the following relief:

    a.    Actual damages incurred by EDA as a result of Leidos' and the Leidos Guarantor's breaches of the Ammonia EPC Contract and the Guaranty Agreement in an amount to be proved at time of trial;

    b.    Actual damages incurred by EDC as a result of Leidos' and the Leidos Guarantor's breaches of the OSBL EPC Contract and the Guaranty Agreement in an amount to be proved at time of trial;

    c.    Actual damages incurred by EDA as a result of Leidos Engineering's breaches of the Engineering Purchase Order in an amount to be proved at time of trial;

    d.    Actual damages incurred by EDA as a result of Leidos Engineering's negligence, professional negligence, and gross negligence in an amount to be proved at time of trial;

    e.    Actual damages incurred by EDA as a result of Leidos' fraud and constructive fraud, together with exemplary damages;

    f.    Attorney's fees;

    g.    Costs of suit;

    h.    Prejudgment and post-judgment interest; and

    i.    Such other and further relief, at law and in equity, to which EDA and EDC may show themselves justly entitled.

Dated:        December 19, 2017

Respectfully submitted,
F. MATTISON THOMAS, III

_____
F. Mattison Thomas, III
Arkansas Bar No. 2002-007
103 East Main, Suite D
El Dorado, Arkansas 71730
Telephone: (870) 866-8451
Facsimile: (870) 881-8416
E-mail:  matt@southarklegal.com
**ATTORNEY FOR EL DORADO
AMMONIA, L.L.C.  and EL DORADO
CHEMICAL COMPANY**

# ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

THIS AGREEMENT ("Agreement") is made and entered into as of the 12th day of August, 2013 ("Effective Date") between El Dorado Ammonia L.L.C., an Oklahoma Limited Liability Company ("Owner") and SAIC Constructors, LLC, an Oklahoma limited liability company ("EPC Contractor").

## RECITALS

A.   WHEREAS, Owner desires EPC Contractor to engineer, and re-construct the ammonia plant ("Plant") known as the 531-NH3 ammonia plant (the "Project"), which is more particularly described in Exhibit A;

B.   WHEREAS, the Owner desires the Plant to be constructed upon Owner's real property located near El Dorado, Arkansas ("Site");

C.   WHEREAS, Owner desires EPC Contractor to provide for the entire Project all Engineering and General Conditions in one fixed cost;

D.   WHEREAS, Owner desires EPC Contractor to provide for the entire Project on an open-book basis, all Work other than Engineering and General Conditions on a pass-through basis, plus 4.5% for overhead and profit;

E.   WHEREAS, EPC Contractor desires to enter into this Agreement as an independent contractor and is ready, willing and able to furnish a complete and operating Project including engineering, procurement of equipment and construction of the Project in accordance with this Agreement; and

F.   WHEREAS, Payments by Owner under this Agreement are guaranteed by Owner's ultimate parent company, LSB Industries, Inc. ("LSB"). Performance by EPC Contractor of this Agreement is guaranteed by EPC Contractor's ultimate parent company, Science Applications International Corporation.

NOW, THEREFORE, in consideration of good and valuable consideration, received or to be received, the sufficiency of which the parties acknowledge, the parties agree as follows:

## ARTICLE 1
## SUMMARY AND CERTAIN DEFINITIONS

1.1.   Summary and Certain Definitions.  EPC Contractor shall provide all necessary Engineering and General Conditions for the Project under the fixed price as set forth in Exhibit B.  EPC Contractor shall provide all labor, materials, supplies, tools, equipment (except for the Owner-Furnished Equipment), products, and facilities necessary to procure any necessary equipment for the construction of the Project upon real property at the Site on a pass-through

basis, plus 4.5%, as set forth in Exhibit C. All pass-through Work shall be performed by EPC Contractor on an open-book basis that allows Owner or its agent to examine actual costs and expenses of EPC Contractor in connection with the Project.

1.2. The output, capabilities and characteristics of the Project will comply with the requirements of this Agreement and shall also include all required activities up to and including accomplishment of Mechanical Completion and Final Completion, and including participation as reasonably necessary in Process Safety Management ("PSM"), Pre-Startup Safety Review ("PSSR") and other commissioning support, further including any design documentation in compliance with this Agreement and its exhibits (hereinafter, the "Work"). The term "Work" includes, but is not limited to all supervision, labor, materials, tools, equipment (except for Owner-Furnished Equipment), supplies and services necessary to engineer and construct the Project as defined in Exhibit A, whether or not such labor, materials, tools, equipment, supplies and services are incorporated in the Project. Work also includes the installation by EPC Contractor of Owner-Furnished Equipment into a fully integrated and functioning Project.

1.3. Certain Definitions.

(a)    "Contract Documents" include this Agreement, and all Exhibits thereto, and the plans and specifications approved by Owner. The Contract Documents include any modifications to any of them whether such modifications upon mutual agreement are made prior to or after the execution of this Agreement. Contract Documents further define the scope of the Project and the Work.

(b)    "Engineering" is all design work, vendor interface and field support required to execute the Project, excluding any design work on Owner-Furnished Equipment.

(c)    "Estimated Contract Price" means the estimated total installed cost prepared by EPC Contractor and includes costs for engineering, procured items and installation of all related equipment and materials, including catalyst and chemicals if so designated by the Owner. The Estimated Contract Price specifically excludes Owner costs, including but not limited to labor and materials for Owner oversight, management, permitting, site preparation, pre-project award costs, and other similar costs incurred directly by the Owner. The Estimated Contract Price as set forth in Exhibit D, is an estimate only, and should not be construed to be a total fixed price for the Project.

(d)    "Final Completion" means that (i) all of the items on the punch list signed by EPC Contractor and Owner have been corrected to Owner's reasonable satisfaction; (ii) if applicable, all lien waivers required under this Agreement have been delivered; (iii) all drawings, as-built plans, vendor operating manuals, warranties and other documents identified for delivery to the Owner have been delivered; and (iv) EPC Contractor has completed its other obligations under this Agreement.

(e)    "General Conditions" is a category of costs often referred to as indirect costs that include budgets for various costs required to support project execution.

2

General Conditions costs include but are not limited to staffing cost, both field and home office staff, such as field supervision, inspection, management, safety, home office support, procurement and project controls. General Conditions also include living and travel expenses for field staff and Project-related travel, temporary facilities such as trailers, portable toilets, communications, printing, mailing and distribution, safety equipment and supplies, protective equipment, etc. General Conditions further include for the Project: (i) Payroll costs, salaries and all other compensation of EPC Contractor's officers, executives, principals, general managers, project managers, engineers, accountants, purchasing and contracting agents, schedulers, expeditors, clerks and other personnel whether stationed at EPC Contractor's principal office or offices or the Site office, <u>except</u> payments made by EPC Contractor directly to Subcontractors, vendors, consultants or suppliers for labor, equipment and materials, including any per diem, payroll taxes, transportation charges and sales tax required by law to be paid in connection therewith, furnished by EPC Contractor and to be incorporated into the Project; (ii) Expenses of EPC Contractor's principal office and branch offices, including the Site office; (iii) Overhead, general and administrative expenses; (iv) EPC Contractor's capital expenses, including interest on EPC Contractor's capital employed for the Work; (v) Rental costs of machinery, equipment, and tools not required to specifically perform the Work; (vi) Costs incurred as a result of the replacement of EPC Contractor's representative; (vii) Premiums for insurance, unless specifically provided in the Agreement as provided at additional cost; and (viii) Any cost or expense not described in <u>Exhibit C</u>, unless approved in advance in writing by Owner.

(f)     "Mechanical Completion" or "Mechanically Complete" shall mean the achievement of the following: Acceptance in writing by Owner of a certificate issued by EPC Contractor certifying that i) the physical completion of the Work relating to the Project in accordance with the terms of this Agreement such that the Work is ready to undergo Start-Up, including, setting of the applicable equipment on foundations; connecting such equipment to other applicable equipment with piping, wiring, controls, and safety systems; ensuring that such equipment and such related operating systems are, as applicable, individually cleaned, pressure tested, leak checked, lubricated, and point-to-point checked to verify that such equipment and such related operating systems have been correctly installed so as to respond to simulated test signals equivalent to actual signals received during operation; and ensuring that such equipment and related operating systems are ready for initial operation, adjustment and testing and may be so operated, adjusted and tested without damage thereto or to any other property and without injury to any person; ii) compliance of the Work and the Project with the agreed to standards where applicable; and iii) completion of the Work so that commissioning of the plant or the applicable portion of the facility may commence. Should Owner achieve 72 hours continuous operation of the Facility at full designed capacity, or less if reduction is not caused by Work of EPC Contractor, then the Facility shall be deemed to be Mechanically Complete.

(g)     "Modification" or "modification" is either a written and signed amendment to this Agreement or a Change Order authorized in writing and signed by Owner and EPC Contractor.

(h)     "Owner-Furnished Equipment" means the following major items of equipment moved from Donaldsonville, LA by Owner, as more specifically set forth in

3

Exhibit A, Section E, Equipment List. This list is expected to change and shall be updated from time to time.

1.4. <u>List of Exhibits</u>.

A   Scope of Work

B   General Conditions and Engineering Fixed Price.

C   Pass-Through + 4.5%

D   Estimated Contract Price

E   Project Schedule

F   Change Order From

G   SAIC Guaranty

H   LSB Guaranty

I   Certain Security, Safety and Regulatory Requirements

## ARTICLE 2
### EPC CONTRACTOR'S SERVICES

2.1.   EPC Contractor's Services. EPC Contractor shall furnish and deliver to Owner an ammonia plant, fully constructed, Mechanically Complete and ready for operation, in the same configuration and operability as when the Plant was located in Donaldsonville, LA, with all ISBL and OSBL associated and ancillary work and connections, and shall also include start-up and commissioning support, maintenance and operations documentation and any and all design documentation in compliance <u>Exhibit A</u>. The portions of the Facility engineered or designed by SAIC shall allow for the capability of production of 1,350 short tons per day of on-specification ammonia. EPC Contractor's Services are further described below.

2.1.1. Based on the scope of Work as more fully set forth in <u>Exhibit A</u>, EPC Contractor shall design the Project in accordance with all applicable local, state and federal law and shall submit proposed, in progress, construction, revised and as-built drawings and construction documentation (i.e., technical and equipment reports, schedules, etc.), including plans and specifications setting forth in detail the design aspects of the Project within EPC Contractor's scope of Work, including but not limited to architectural, electrical, mechanical and structural systems of the Project, for review and approval or disapproval by Owner and shall:

2.1.2. Perform the Work as appropriate to complete the Work in accordance with the Estimated Contract Price (<u>Exhibit D</u>) and the Project Schedule (<u>Exhibit E</u>);

4

2.1.3.  Enter into direct contracts with Subcontractors and material suppliers and be fully responsible for their work, including the timeliness, quality and price of their Work.  EPC Contractor shall consult with Owner and keep Owner informed on an ongoing basis regarding the selection of Subcontractors whose cumulative budgeted work is over $100,000.  In the event that any such Subcontractor's actual quote or estimate is over ten percent (10%) in excess of the budgeted amount under the Estimated Contract Price, and if such excess can be feasibly reduced by re-engineering to improve the constructability of the feature, then such re-engineering to reasonably improve constructability will be performed by EPC Contractor for no additional engineering cost to Owner.

2.1.4.  Review and process all applications for payment by Subcontractors and material suppliers for monthly progress and final payments; pay all Subcontractors and material suppliers directly; require that the Subcontractors and material suppliers furnish an acknowledgement of payment/waiver of lien in a form approved by Owner with each application for payment certifying that money has been received for performance of their subcontract during the previous payment period, and to the extent legally permitted, waiving to the extent of payments received any right to file or assert a mechanic's and materialmen's lien therefor;

2.1.5.  Maintain a competent full-time staff at the Site including a full time construction manager, as provided in Section 11.1, to supervise and confirm that the Work and progress of the Subcontractors is in full compliance with the plans and specifications and completion dates set forth in this Agreement.  EPC Contractor shall be solely responsible for the means, methods, techniques, sequences, and procedures for all portions of the Work;

2.1.6.  Perform all necessary preparation for designated laydown areas, storage areas or areas needed for access of materials and equipment;

2.1.7.  Secure, monitor and coordinate Subcontractor activity to complete the Work in a coordinated, integrated and functional manner.  Construction services shall be performed by qualified construction contractors and Subcontractors.  Security checks and management of personnel for access to the Site shall be performed in accordance with all legal and regulatory requirements and in coordination with Owner;

2.1.8.  Provide all Engineering necessary to engineer and construct the Project.  Engineering services shall be performed by qualified engineers and other professionals, properly qualified, experienced and licensed to perform those services.  EPC Contractor shall perform its services in a manner consistent with that degree of care and skill ordinarily exercised by members of the profession currently practicing under similar circumstances in the same locale.  No other warranty or guarantee, express or implied, is made or intended by this Agreement, except as provided in Section 14.3 below.  Any

reports, drawings, plans or other work products produced under this Agreement are part of EPC Contractor's professional services and do not constitute goods or products;

2.1.9.  Procure for Owner all needed manufacturing equipment and other equipment to be incorporated into the Project, except the Owner-Furnished Equipment;

2.1.10. Keep Owner informed of the procedures, sequencing, progress, problems and scheduling of the Project;

2.1.11. Provide, update and maintain the Project Schedule (Exhibit E);

2.1.12. Provide a Project payment schedule on a monthly basis, invoicing separately on a separated contract basis for pass-through labor, services, materials, equipment and construction equipment, invoicing separately for all equipment and components that Owner advises EPC Contractor believes are exempt from Arkansas sales tax and invoicing separately for Engineering and General Conditions;

2.1.13. Manage the Project in accordance with the technical, environmental, security, safety, OSHA and industrial hygiene standards applicable in Arkansas and consistent with Owner's standards, rules and requirements for the Site;

2.1.14. Provide quality control and inspect the Work for defects and deficiencies in the Work to confirm that the Work is in full compliance with the plans, specifications and this Agreement.  Provide expert inspection during fabrication, testing, demonstration, delivery and installation of all equipment for quality control purposes.  Establish procedures to promptly correct any non-conformity with appropriate notice to vendors, manufacturers, Subcontractors, suppliers and Owner.  Implement a written control program to provide notice to the Owner of any non-conforming work, materials or equipment, develop and implement remedial measures and provide for re-inspection upon correction of the non-conformity;

2.1.15. Record the progress of the Project and submit a monthly comprehensive progress report to Owner.  Keep and maintain an accurate and comprehensive daily log on the Site and available to Owner upon request.

2.1.16. Maintain at the Project site on a current basis records of all necessary Contract Documents, samples, purchases, materials, computer models, equipment, maintenance and operating manuals and instructions, and other construction-related documents, including all revisions; obtain data from Subcontractors and maintain a current set of drawings, specifications and operating manuals and at the completion of the Project, deliver to Owner all such records and as-built drawings, as provided in Exhibit C, and all hard copies and in electronic format (original Word or Office document or scan);

6

2.1.17. Be responsible at all times for enforcing reasonable discipline and good order among its employees and/or the employees of the Subcontractors. If any person on the site of the Work shall appear to be incompetent, disorderly or intemperate, in any way disrupts or interferes with the Work, presents a security risk, or is in any other way disqualified for or unfaithful to the job entrusted to him, such person shall be promptly reassigned to tasks unrelated to this Project and he shall not again be employed on the Work or allowed access to the Site without the prior written consent of Owner;

2.1.18. Be solely responsible for all Project site-specific safety orientation, safety orders, rules, precautions and programs necessary for the safety and security of the Work; take precautions to secure the safety of all of EPC Contractor's employees and others for which it has direct supervision and control and which are involved in the Work, all equipment and materials incorporated in the Work, all property on the site of the Work and adjacent to it, and remain cognizant of Owner's affiliates operations which are on the Site of the Work or in the vicinity of it. EPC Contractor will maintain pro-active safety and security program, in fulfillment of and in compliance with all legal and regulatory requirements, as provided in Exhibit I. EPC Contractor shall maintain a qualified Safety Manager on site at all times during construction of the Project;

2.1.19. Give all notices and comply with all laws, ordinances, rules, regulations and permits and orders of any local, state or federal authority having jurisdiction over the Work, or which have any bearing on the execution of the Work. If EPC Contractor observes that any of the Contract Documents are at variance in any respect with any such laws, ordinances, rules, regulations and orders, it shall promptly notify Owner in writing and any necessary changes shall be promptly made. If EPC Contractor fails to give such notice or executes any of the Work in a manner contrary to any such laws, ordinances, rules, regulations or orders, it shall bear the resulting costs to correct said Work to comply with such laws and regulations;

2.1.20. Perform testing, including PMI (positive materials identification) on materials and equipment in accordance with applicable codes and laws, and the Baker Risk provided program. EPC Contractor shall provide to Owner the results of all such testing;

2.1.21. Correct Work which does not conform to the Agreement at no cost to Owner;

2.1.22. Procure and provide materials and equipment to be incorporated in the Work that are new and warrant that the Work will be of good quality, and in conformance with the Contract Documents. EPC Contractor shall provide on-site coordination of services for any Owner-Furnished Equipment to be refurbished on site or after receipt at the site. Owner shall provide the Owner-Furnished Equipment and shall refurbish said equipment at its costs and responsibility.

7

2.1.23. Retain only first quality, competent and qualified Subcontractors;

2.1.24. Be responsible for and pay all duties and taxes on all materials and equipment for the Project, such costs to be considered as pass-through costs to Owner's account except as such costs may relate to Engineering and General Conditions;

2.1.25. Maintain the Project site reasonably free from accumulation of waste materials or rubbish caused by EPC Contractor's operations. At the completion of the Work, EPC Contractor shall remove from the Site EPC Contractor's temporary objects and facilities, tools, construction equipment, machinery, surplus materials, waste materials and rubbish;

2.1.26. Prepare Change Orders for Owner's approval and execution in accordance with the Agreement and submit them for Owner's approval prior to beginning any work on such Change Order. EPC Contractor shall have authority, subject to notice to Owner, to make such minor changes in design prior to supply of the delivered facility and within the intent of the Agreement that will not affect the quality, performance, extend the date of completion or require review or action under any applicable rules, regulations, statutes, ordinances or codes;

2.1.27. Obtain and keep current its operating permits as well as the documents proving legal ability to execute the Work. Copies of such documents shall be provided to Owner by EPC Contractor upon request.

### ARTICLE 3
### OWNER'S SERVICES AND RESPONSIBILITIES

3.1     Timely Performance. Owner shall throughout the performance of this Agreement reasonably cooperate with EPC Contractor. Owner shall perform its responsibilities, obligations and services, including its reviews and approvals of EPC Contractor's submissions, in a reasonably timely manner so as not to delay or interfere with EPC Contractor's performance of its obligations under this Agreement.

3.2     Owner Provided Information and Equipment. Owner shall provide, at its own cost and expense, for EPC Contractor's information and use, the following, all of which EPC Contractor is entitled to rely upon (absent manifest error) in performing its obligations hereunder:

3.2.1   Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines;

3.2.2   Geotechnical studies describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site;

3.2.3   Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use or necessary to permit the proper design and construction of the Project;

8

3.2.4   A legal description of the Site;

3.2.5   To the extent available, as-built and record drawings of any existing structures at the Site; and

3.2.6   To the extent available, environmental studies, reports and impact statements describing the environmental conditions, including, but not limited to, hazardous conditions, in existence at the Site.

3.2.7   Owner shall provide all Owner-Furnished Equipment, and vendor support, in accordance with the schedule.  Said equipment shall be refurbished at Owner's cost and responsibility.  Owner shall cooperate with EPC Contractor in the coordination of the refurbishment of said equipment.

3.2.8   Owner shall provide a means of disposal for all hydro test water.

3.2.9   Owner shall be responsible for development and implementation of the Facility PSM and PSSR programs.  EPC Contractor will cooperate with Owner in its development of said programs.

3.2.10  Owner shall be responsible for providing the process to EPC Contractor, and shall be responsible for the performance of the Plant, except to the extent this Agreement places responsibility on EPC Contractor for any Work,

3.3   Owner shall be responsible for start-up and commissioning of the Plant, subject to assistance by EPC Contractor as provided in this Agreement.

## ARTICLE 4
## PROGRESS OF THE WORK

4.1   Commencement and Completion. EPC Contractor shall commence the Work immediately and shall achieve Final Completion, including without limitation Mechanical Completion, all Project construction and commissioning support services not later than July 31, 2015 (the "Completion Date"). All ISBL facilities necessary to produce ammonia and control associated emissions, as well as the cooling tower, water treatment system and storage tank (the "OSBL Components" as further described and set forth in Exhibit A), shall be completed and ready for operations by the Completion Date.  The Completion Date may be altered only as provided in this Agreement and any liability for EPC Contractor thereto is limited as further set forth in Article 20 herein.

4.2   Scheduling.

4.2.1 Scheduling and Time Extensions.  Attached as Exhibit E to this Agreement is a progress schedule ("Project Schedule") setting forth the durations for all the major items of Work to be performed; the start and finish date of all such activities; the performance tests; and the Completion Date of the Project.  EPC Contractor shall submit to Owner updated Progress Schedules each month to reflect the actual progress made and

9

to forecast future progress of the Work. The Completion Date shall be extended only for such number of calendar days as the Work is actually delayed by acts of God, acts or omissions of Owner, delays in the issuance of required permits occurring after September 1, 2013, the presence of any undisclosed hazardous substances (including, but not limited to Hazardous Materials) affecting the Work, a casualty, change in law, flood, fire, or a change order, plus a reasonable number of additional days to allow EPC Contractor to resume Work following such delay, and only then if it is not feasible for EPC Contractor to avoid or to mitigate the impact of the delay ("Unavoidable Excusable Delay"). No extensions to the Completion Date shall be granted due to the negligence or fault of EPC Contractor or its Subcontractors or untimely delivery of equipment or the non-availability of materials or labor, not including the Owner-Furnished Equipment and materials. In order to obtain a time extension due to an Unavoidable Excusable Delay, EPC Contractor must give written notice to Owner within five (5) working days after the commencement of each Unavoidable Excusable Delay, including a description of actions taken to avoid or mitigate the delay and a proposed action plan or re-sequencing to minimize the impact on the Project.

    **4.3**    Liquidated Damages. It is mutually agreed that if EPC Contractor does not complete the Work to the point of Final Completion by the Completion Date, Owner will sustain damage, the precise amount of which is difficult to determine at the time of making this Agreement.

    **4.3.1**    Up to a maximum total amount of $500,000, EPC Contractor shall pay to Owner as liquidated damages and not as a penalty the sum of $5,000 per day for each full day of delay if EPC Contractor fails to achieve Mechanical Completion by September 30, 2015 (subject to automatic extension for Unavoidable Excusable Delay), provided such delay is due to a) failure by EPC Contractor to prosecute the Work with diligence, or b) EPC Contractor's or Subcontractor's negligence.

EPC Contractor further agrees that any assessment by Owner of liquidated damages or payment by EPC Contractor to Owner of liquidated damages is to compensate Owner only for the damages arising out of EPC Contractor's delay in achieving the Completion Date, and is not a release of any of Owner's other rights or claims against EPC Contractor, including claims of Owner for defective or improper workmanship of EPC Contractor.

## ARTICLE 5
## PAYMENT

    5.1    Fixed Price Portion of Work. Owner and EPC Contractor agree that EPC Contractor shall be paid for all Engineering Services and all General Conditions for a fixed price, as provided in Exhibit B.

5.2     Variable Cost Portion of Work.  Owner and EPC Contractor agree that EPC Contractor shall be paid in accordance with Exhibit C for all Construction Work, excluding Engineering Services and General Conditions included in Exhibit B.

5.3     Payment Procedure.  During the course of the Project, progress payments shall be made by Owner to EPC Contractor as follows:

(a)     On or before the twenty-fifth day of each calendar month during the performance of the Work or the preceding working day if the last day is a Saturday, Sunday or holiday, EPC Contractor shall submit to Owner an application and certificate for payment, based on the Work completed during the preceding month, using a form approved by Owner.

(b)     Each application and certificate for payment shall be accompanied by: (1) copies of all vendors and Subcontractors invoices; (2) a separation of construction materials, services, labor, equipment and manufacturing equipment materials; (3) releases and lien waivers from EPC Contractor and all Subcontractors and vendors; and (4) other documentation as may be requested by Owner for its proper review of the application and certificate of payment.

(c)     Payments by Owner shall be made on or about the 25th day of the following month in which an approved Application and Certificate for Payment properly certified and verified has been submitted or the next working day if the 25th day of the month is a Saturday, Sunday or holiday. EPC Contractor shall be entitled to 1% interest per month on any late payments. Owner reserves the right to verify the accuracy of any such payments both during the Project and upon completion. EPC Contractor shall within a reasonable time period reimburse Owner for any overpayments made during the course of the Project or upon completion. If Owner disputes any portion of EPC Contractor's Application, Owner shall pay the undisputed portion as set forth in this Section 4.3(c), and any disputed portion of the Application shall be subject to the Dispute Resolution provision in Section 23.13 of this Agreement. If Owner fails to make payment to EPC Contractor when due, EPC Contractor shall, after fifteen (15) days notice to Owner to cure, stop all Work until such time as Owner pays amounts not in dispute and due EPC Contractor. If after EPC Contractor stops work, Owner cures such failure to pay, EPC Contractor shall remobilize to the Site and be entitled to seek a Change Order for additional costs or fees associated with EPC Contractor's demobilization and remobilization to the Site, as well as for any extension of the Completion Date. If Owner's failure to pay continues for a period of sixty (60) additional days, EPC Contractor may terminate this Agreement.

5.4     Use of Payments.  EPC Contractor shall use all sums paid to it pursuant to this Agreement for the performance of the Work in accordance with the Contract Documents.  Upon the request of Owner, EPC Contractor shall furnish satisfactory proof as to the disposition of any monies paid to EPC Contractor by Owner; provided that no provision shall be construed to require Owner to see to the proper distribution, disposition or application of the monies paid to EPC Contractor.

5.5     Payment Not a Waiver.  Neither the approval or making of any payment to EPC Contractor, nor the partial or entire use or occupancy of the Project by Owner shall be an acceptance of any portion of Work.

5.6     Final Payment.

(a)     Final payment by Owner is due upon Final Completion but shall not constitute a waiver of claims by Owner arising from terms of warranties unsettled liens, incomplete or defective workmanship, defective materials, or for failure of the Work to comply with requirements of the Contract Documents provided by EPC Contractor under this Agreement.

(b)     Final Completion and final acceptance of the Work shall occur only after all Work (including punch list items) provided for in the Contract Documents has been finally completed and accepted in writing by Owner.

(c)     Thereafter final payment shall become due upon EPC Contractor delivery to Owner the following:

(i)     written statement that all payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which Owner or its interest in the property, or the Site or the Project might in any way be responsible, have been paid, or will be paid with funds received from final payment, or otherwise satisfied, along with any documentary evidence requested by Owner, including without limitation, lien waivers;

(ii)     other data establishing payment or satisfaction of all such obligations, such as receipts, releases and waivers of liens, arising out of the Work, to the extent and in such form as may be designated by Owner;

(iii)     Warranties assigned to the Owner; and

(iv)     Operating manuals set forth in Exhibit A.

5.7     The Right of Owner to Withhold Payment. Owner may, on account of subsequently discovered evidence, withhold or nullify the whole or part of any payment, including Final Payment, to such extent as may be necessary to reasonably protect itself from any of the following:

(a)     defective Work not remedied;

(b)     third-party claims for payment or liens filed or reasonable evidence indicating the probable filing of such claims or liens;

(c)     failure of EPC Contractor to make payments properly due to Subcontractors pursuant to applicable subcontracts or purchase orders or failure of the Subcontractors to make payment properly due for any portion of the Work or failure of EPC Contractor or its Subcontractors to make payment properly due for equipment, materials or labor;

(d)     evidence of fraud, over-billing or overpayment discovered upon audit or otherwise;

(e)     failure of EPC Contractor to prosecute the Work in accordance with the Contract Documents; or

(f)     damage to Owner or Owner's affiliates caused by EPC Contractor, or any entity for whom EPC Contractor is responsible.

## ARTICLE 6
## EQUIPMENT AND MATERIALS

6.1     Materials Provided by EPC Contractor.

(a)     EPC Contractor shall provide and pay as a cost of the Work for all equipment, materials, labor, tools, equipment, light, transportation, and other facilities necessary for the performance of the Work, excluding Owner-Furnished Equipment. Water and power is to be provided by Owner.

(b)     All equipment, machinery, material, and articles incorporated in the Work shall be of good quality and new, or as refurbished as like-new for items moved from Donaldsonville, LA.

6.2     EPC Contractor Equipment Procurement.

6.2.1   Except for the Owner-Furnished Equipment, EPC Contractor shall procure and pay for all manufacturing equipment, equipment and materials to be incorporated in the Work or necessary for operation or continued operation of the Project, including any

13

spare parts and components set out in Exhibit A. Owner shall provide to the Project for installation by EPC Contractor all Owner-Furnished Equipment.

6.2.2   EPC Contractor shall be solely responsible for ordering, expediting, testing, shipping, cleaning and transporting all equipment (except for Owner-Furnished Equipment) and materials to the Project and verifying that all utilities and services are adequate for operation and are connected properly and ready for operation. EPC Contractor shall take reasonable steps or actions necessary to cause the equipment and materials to arrive at the Site at such time that they are required to support the Project Schedule and Completion Date.

6.2.3   EPC Contractor shall be fully responsible for the care, custody, and control of all manufacturing equipment, equipment and materials and security of site until Mechanical Completion of the Project or turnover to Owner, whichever occurs earlier.

## ARTICLE 7
## DATA

7.1     As-Built Drawings. A set of drawings shall be maintained by EPC Contractor at the Site and shall be updated throughout the Project for the purpose of showing "as built" conditions. The drawings shall be kept up-to-date and regularly and timely marked to show all changes and variations and each entry shall be dated and verified as made. At the completion of the Work and prior to final payment, a set of final CAD files reflecting "as-built" conditions shall be submitted to Owner. All such information shall be provided in hard copy, electronic form (original Word or Office document or scan) and on-line, during the project, through EPC Contractor-provided web portal. EPC Contractor will not be liable for any subsequent use, reuse or changes in the Work, (collectively "Subsequent Changes"), including as-built drawings and CAD files, by the Owner or third parties without the involvement of EPC Contractor, and such use of the Work based on Subsequent Changes shall be at the Owner's or third party's sole risk.

7.2     Operation and Maintenance Data.

(a)     EPC Contractor shall furnish , in electronic format, shop drawings, "as-installed" conditions, CAD files, sources of equipment and principal materials, vendor recommended maintenance schedules, vendor repair and maintenance data, vendor lubrication instructions and recommendations, parts lists, and other catalog data or information within EPC Contractor's custody and control, required to operate and maintain any part of the Work (herein the "Data"). Care shall be taken to include all pertinent data and to exclude inapplicable or duplicate information.

(b)     Installation information for all machinery and equipment also shall be kept on the site of the Work during construction. All such information shall be provided in electronic form (original Word or Office document or scan).

14

7.3     Information from Suppliers.  EPC Contractor shall make it a requirement or condition of purchase from its suppliers of equipment and/or materials that each supplier (1) furnish complete and adequate operating and maintenance data pertaining to their equipment, (2) assign to Owner any warranty, express or implied, furnished by the manufacturer of the equipment, and (3) to assign to Owner any customary maintenance or repair service, spare parts supply service, or personnel support service furnished by the manufacturer of the equipment.

## ARTICLE 8
## SUBCONTRACTS

8.1     Definition.  As used in the Contract Documents, a "Subcontractor" is a person or organization that has a contract with EPC Contractor, or any other entity working under EPC Contractor's contractual chain of privity, to perform any portion of the Work, to furnish any product, furnish any technology license, technical assistance or advice, or to furnish any article, machinery, equipment or materials to the Work.

8.2     No Contractual Relationship with Owner.  Except as expressly provided by this Agreement, Article 22 - Right to Terminate of Owner, nothing contained in the Contract Documents or otherwise shall create any contractual relationship between Owner and any Subcontractor, except that it is understood and agreed that Owner is an intended third party beneficiary of all (i) contracts with design professionals; (ii) subcontracts; (iii) purchase orders; and (iv) other agreements between EPC Contractor and third parties.  EPC Contractor shall incorporate the obligations of this contract with Owner in its respective contracts with design professionals, subcontracts, supply agreements, purchase orders and other agreements.  No subcontract shall relieve the Subcontractor of its responsibilities and obligations should any Subcontractor fail to perform the Work in a satisfactory manner.  EPC Contractor is fully responsible to Owner for the acts and omissions of its Subcontractors and of persons either directly or indirectly employed by them.

8.3     Approval of Subcontractors.  Based on substantial and/or material reasons, Owner reserves the right to reject any unsatisfactory Subcontractor on the basis of safety record, financial status, insufficient resources, security risk, or other criteria which could negatively impact the successful on-time completion of the Project.  Good faith and reasonableness will govern any such decision.  Owner's approval of Subcontractors does not relieve or release EPC Contractor from full responsibility for the adequate, conforming and timely performance of the Work.  EPC Contractor is solely responsible for ensuring that all Subcontractors are qualified to perform their work timely and in accordance with the plans, specifications and this Agreement.

8.4     Subcontract Terms and Conditions.  All portions of the Work performed by a Subcontractor shall be pursuant to a written agreement acceptable to Owner and which shall contain provisions that:

(a)     preserve and protect the rights of Owner under the Contract Documents with respect to the portion of the Work to be performed under the subcontract so that the subcontracting will not prejudice such rights;

(b)     require that all Work be performed in accordance with the requirements of the Contract Documents;

(c)     require that all work comply with the requirements of OSHA and all other applicable engineering codes, construction codes, and other applicable codes or applicable trade or legal regulations.

(d)     require that all work comply with all federal, state and local environmental statutes, regulations and ordinances, including without limitation, environmental statutes, regulations and ordinances;

(e)     require the Subcontractor to meet standard on-site contractor requirements as established by Owner and by the El Dorado Chemical Company plant.

(f)     require submission to EPC Contractor of periodic applications for payment accompanied by a release and lien waiver to the extent of each payment;

(g)     require that all requests for change order, additional compensation or extensions of time be submitted to EPC Contractor in sufficient time so that EPC Contractor may comply in the manner provided in the Contract Documents for like requests by EPC Contractor upon Owner; and

(h)     establish that the Owner is an intended third-party beneficiary of the subcontract, agreement or purchase order, provided that if any Subcontractor refuses to agree that the Owner is a third-party beneficiary of the subcontract, EPC Contractor shall so advise Owner, and Owner shall consider the circumstances and alternatives and may reasonably waive this requirement on a case by case basis.

## ARTICLE 9
## CHANGES

9.1     Changes in the Work.

(a)     Either Party, without invalidating the Agreement, may order or seek extra Work or make changes by altering, adding to or deducting from the Work by executing a Change Order in the form provided by Owner, attached as Exhibit F.  All work performed pursuant to a Change Order shall be performed under the terms and conditions of the Contract Documents.

(b)     Owner shall have authority to make changes in the Work not involving extra cost, and not inconsistent with the purposes of the Project, but otherwise, no extra work or change in the Work shall be made unless pursuant to a written Change Order. No claim by EPC Contractor for additional compensation, cost or fee or any extension of the Completion Date shall be valid unless provided in a Change Order.

9.2     Change Order Procedure.  Upon receipt of a request from Owner, or upon its own request, for extra work or changes in the Work, or for deletions or reductions in scope, EPC Contractor shall furnish to Owner, within five (5) calendar days, a statement setting forth in detail the proposal of EPC Contractor for performing the extra work or changes or for deleting the work or reducing the scope and the effect of the extra work or changes, of the deletions or reductions, if any, on the contract price and Completion Date. If Owner approves in writing the proposal of EPC Contractor, a Change Order in the form provided by Owner shall be executed by the parties and the contract price and the Completion Date shall be adjusted. All Change Orders must be executed by Owner's authorized representative or such other individual designated in writing by an officer of Owner, subject to any limitations set forth in such written designation, in order to be valid.

9.3     Change Order Pricing.

(a)     Increases in the Scope.  Any increase in the contract price attributable to a Change Order performed by EPC Contractor or any of its Subcontractors shall not exceed the sum of the following:

(i)     the actual costs to EPC Contractor to perform the Change Order, as calculated from the Rate Schedule attached to Exhibit F, Change Order form; and

(ii)    the actual cost of Subcontractors to perform the Change Order, with a 4.5% mark-up;

(b)     Decreases in the Scope.  The decrease in the contract price attributable to a Change Order deleting or modifying a portion of the scope of Work shall equal all costs incurred to execute such deductive change order less the sum of the following:

(i)     the actual labor cost that EPC Contractor would have incurred to perform the scope of Work deleted in the Change Order;

(ii)    the actual cost of Subcontractors or materials that EPC Contractor would have incurred in performing the scope of Work deleted in the Change Order;

9.4     Unconditional Obligation to Proceed.  Notwithstanding anything herein to the contrary, EPC Contractor will proceed with the Work when so directed by Owner in writing and

17

attempt in good faith to comply with the Completion Date as amended by Owner's directed change, even if it has a dispute with Owner concerning the amount to be paid under Section 8.3 or any extension of time which is or could be due to EPC Contractor pursuant to a Change Order.

<div align="center">

ARTICLE 10
THE UNDERSTANDING OF EPC CONTRACTOR
</div>

10.1    Unforeseen Work Site Conditions. If concealed or unknown conditions, including, but not limited to, surface, subsurface and/or site environmental conditions, which affect in whole or in part the performance of the Work are encountered, then EPC Contractor shall stop work and give written notice thereof to Owner before conditions are further disturbed and promptly after first observing such changed conditions by EPC Contractor. The Agreement (e.g., costs, prices, schedule, etc.) shall be adjusted in accordance with the changes clause.

<div align="center">

ARTICLE 11
THE REPRESENTATIVE OF OWNER
</div>

11.1    The Representative of Owner. Representative of Owner shall have full authority to stop the Work whenever in the best judgment of the Representative of Owner, such stoppage may be necessary to insure the proper execution of the Work and the Agreement shall be equitably adjusted as a result of any wrongful stoppage. The Representative of Owner shall have authority to reject any Work and materials which do not conform to the Contract Documents, and to decide questions which arise during the execution of the Work. The Representative of Owner shall also designate in writing all persons affiliated with Owner who are authorized to have access to the Work. Owner shall have the right to replace the Representative of Owner at any time with or without cause, following written notice to EPC Contractor.

<div align="center">

ARTICLE 12
SUPERVISION OF THE WORK
</div>

12.1    The Construction Manager of EPC Contractor. EPC Contractor shall designate in writing to Owner, and keep assigned to the Work during its progress, a competent Construction Manager satisfactory to Owner. The Construction Manager shall be Patrick Noonan. The Construction Manager shall be changed upon written request of Owner, but shall not be changed by EPC Contractor except with the consent of Owner (which consent shall not be arbitrarily withheld), unless the Construction Manager ceases to be in its employ. The Construction Manager shall represent EPC Contractor and all directions given to him by Owner shall be binding as if given to EPC Contractor directly. The Construction Manager shall devote full time to the Work and shall maintain his office on the site of the Work. He shall direct, coordinate and supervise all Work, inspect all materials, excluding Owner Furnished Equipment, delivered to the Project to ascertain whether or not they comply with the requirements of the Contract Documents, and reject all non-conforming materials or workmanship.

<div align="center">

18
</div>

12.2.  Owner's Right to Review the Work.

(a)     Owner and persons designated by Owner shall at all times have access to the Work whenever it is in preparation or progress and EPC Contractor shall provide proper facilities for such access and for a detailed review of the Work by Owner.  If Owner discovers any Defective Work in connection with any review, it shall report such Defective Work to EPC Contractor and EPC Contractor shall, at no cost to Owner, immediately correct the defective work.

(b)     If the Contract Documents, the written instructions of Owner, laws, ordinances, rules or regulations, or any public authority require any of the Work to be specifically tested or inspected, EPC Contractor shall give Owner timely notice of its readiness for inspection and testing, and if the test or inspection is performed by an authority other than Owner, of the date set for such test or inspection.  Inspections by Owner shall be promptly made and, where practicable, at the source of supply.  If any of the Work should be covered up without the approval or consent of Owner or any necessary authority, it shall be uncovered for examination, if required by Owner or such other authority, at the sole expense of EPC Contractor.

(c)     Re-examination of questioned work that has been previously inspected by Owner may be ordered by Owner and, if so ordered, the questioned work shall be uncovered by EPC Contractor.  If such work is found to be in compliance with the Contract Documents, Owner shall pay the actual documented and verified cost of the re-examination and if such re-examination causes the Completion Date to be extended, grant a time extension and shall pay all costs incurred as a result of such extension via the contract change procedure accordingly.  If such work is found not to be in compliance with the Contract Documents, EPC Contractor shall bear the costs of the re-examination, and the costs to correct.

## ARTICLE 13
## THE RIGHT OF OWNER TO AUDIT

13.1   Owner shall have the right, but not the obligation, to audit or examine all cost documents, cost records, pertaining to the Project through the Project and for one year after Final Completion, excluding EPC Contractor's documentation to support any fixed price portion of the Work.

## ARTICLE 14
## SEPARATE CONTRACTS

14.1    The Right of Owner to Award Separate Contracts.  Owner reserves the right to award other contracts in connection with the Project (but not within EPC Contractor's scope of Work under this Agreement) at or in the vicinity of the Project and EPC Contractor agrees to cooperate fully and not to unreasonably interfere with the work of such other contractors. Notwithstanding anything to the contrary, in the event that Owner reasonably believes that EPC Contractor is not sufficiently skilled or lacks required expertise or does not provide a reasonable value to Owner for particular portions of the Work or areas subject to Change Orders, then Owner may award such work to third party contractors.

14.2    Responsibility for Damage.  Should EPC Contractor cause damage to the Work, the Owner's property, the property of third parties or to any person, EPC Contractor shall reimburse the Owner or such other damaged or injured person for all associated costs and expenses for the repair or replacement of the damaged property, excluding any consequential loss as set forth in Section 19.4.  If such damaged person sues or arbitrates with Owner or Owner affiliates on account of any damage alleged to have been caused in whole or in part by EPC Contractor or anyone for whom EPC Contractor is responsible, Owner shall notify EPC Contractor who shall indemnify and hold Owner or Owner affiliates harmless and continuously defend such suit or arbitration at the expense of EPC Contractor, and if any judgment or award against Owner or Owner affiliates results, EPC Contractor shall pay or satisfy the award.

## ARTICLE 15
## WARRANTIES OF EPC CONTRACTOR

15.1    Warranty of Title.  EPC Contractor agrees that title to all Work, materials, products and equipment that has been incorporated into the Facility will pass to Owner, free and clear of all liens, security interests or encumbrances (herein "Liens") upon full payment due to EPC Contractor for such portions of the Work, being made by Owner and that none of the Work, materials, products or equipment covered by an application and certificate for payment will have been acquired by EPC Contractor, or by any other person performing any part of the Work or furnishing materials and equipment for the Work, subject to an agreement under which a Lien is retained by the seller or supplier.

15.2    Assignment of Warranties.  EPC Contractor hereby assigns to Owner any and all existing assignable warranties of manufacturers of equipment or items incorporated in the Work. The EPC Contractor shall deliver all warranties, to the Owner prior to Final Completion.  Upon the request of Owner, EPC Contractor shall give Owner assistance in enforcing the rights of Owner arising under such warranties.  Without request of Owner, EPC Contractor shall give notice (with copies to Owner) to any such manufacturers of the assignment to Owner and its successors or assignees to the Project of such warranties.

20

15.3   General Warranty and Correction of Work.

(a)   In addition to any other warranties contained in the Contract Documents, EPC Contractor warrants to Owner and its successors or assigns to the Project that all materials and equipment furnished by EPC Contractor in performance of the Work will be new, that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards shall be considered defective and corrected by EPC Contractor at no cost to Owner ("Defective Work").

(b)   EPC Contractor shall promptly correct all Defective Work to the standards of this Agreement and the Contract Documents whether observed before or after the Completion Date and whether or not fabricated, installed or completed. EPC Contractor shall bear all costs of correcting such Defective Work.

(c)   If, within one (1) year from Mechanical Completion of the Work any of the Work is found to be defective and not in accordance with the Contract Documents, EPC Contractor shall correct it promptly upon receipt of a written notice to do so from Owner or any successor or assign of Owner.

(d)   If EPC Contractor fails to correct Defective Work in accordance herewith and the Contract Documents, Owner or its successor or assign may correct it and hold EPC Contractor liable for all costs, expenses and damages, including redesign fees, attorney's fees and litigation costs incurred by any of them in correcting it.

(e)   In addition to the foregoing warranty, if any Defective Work in material or workmanship is discovered during the warranty period, a warranty period of one (1) additional year shall apply to workmanship, material and equipment under the same terms and conditions as the original warranty, to any work, supplied in correction of the Defective Work under warranty pursuant to the provisions of this Section 14.3 and EPC Contractor shall assign to Owner or its successor or assign any warranties, including extended warranties, as to materials or designs furnished in the performance of such correction of Defective Work. Such warranty period shall commence on the date Owner or its successors or assigns accepts the corrective work of EPC Contractor.

## ARTICLE 16
## RIGHT OF OWNER TO DO WORK

16.1   Right of Owner to Do Work. If EPC Contractor should neglect to prosecute the Work properly or fail to do anything required by the Contract Documents, and Owner does not receive acceptable assurances from EPC Contractor of or EPC Contractor does not undertake reasonable steps for due performance satisfactory to Owner within ten (10) days after written demand is made, then Owner may, without prejudice to any other remedy it may have under this Agreement or at law or in equity, make good any deficiencies in the Work.

16.2    Deduction for Uncorrected Work. If Owner reasonably and in good faith deems it inexpedient to correct deficiencies in the Work pursuant to Section 15.1, Owner may deduct the reasonable cost of doing so from the payment then due, any retainage held by Owner, or any payment thereafter due EPC Contractor, but the making of such a deduction shall in no way be deemed an election or limitation of remedies by Owner.

## ARTICLE 17
## INSURANCE

17.1    Liability Insurance. Prior to the commencement of any operations by or on behalf of EPC Contractor relating to the Project, and with respect to any and all such operations, EPC Contractor shall procure and provide to Owner the insurance described in this Article 16 from insurers with a rating by A.M. Best of A-VIII or better, and further obtain endorsements on all policies where possible to name Owner and other identified entities as additional insureds.

17.1.1 Commercial General and Umbrella Liability Insurance. EPC Contractor shall maintain commercial general liability (CGL) and commercial umbrella insurance with a limit of not less than $1,000,000 for each occurrence and aggregate.

(a)     CGL insurance shall cover liability arising from premises, operations, independent contractors, products-completed operations, sudden and accidental pollution, personal injury and liability assumed under an insured contract (including the tort liability of another assumed in a business contract).

(b)     EPC Contractor shall maintain CGL and commercial umbrella liability insurance with a limit of not less than $10,000,000 for each occurrence and aggregate, for at least 1 year following completion of the Work. Unless otherwise set forth below, the continuing CGL insurance shall meet all of the requirements set forth above in Paragraphs (i) and (ii). Continuing CGL insurance shall, at minimum, cover liability arising from products-completed operations and liability assumed under an insured contract. Continuing commercial umbrella coverage, if any, shall include liability coverage for damage to the insured's completed work equivalent to that provided under ISO form CG 00 01 10.

17.1.2 Business Auto and Umbrella Liability Insurance. EPC Contractor shall maintain business auto liability and, if necessary, commercial umbrella liability insurance with a limit of not less than $10,000,000 per occurrence, with no aggregate limit. Such insurance shall cover liability arising out of any auto (including owned, hired and non-owned autos).

22

17.1.3 Workers Compensation Insurance. EPC Contractor shall maintain workers compensation and employers liability insurance.

(a)    the employers liability and/or commercial umbrella limits shall not be less than $10,000,000 each accident for personal injury by accident or $10,000,000 each employee for personal injury by disease.

17.1.4 Umbrella Excess Insurance. EPC Contractor shall maintain umbrella excess insurance (over automobile, CGL and employers liability) in the amount of $10,000,000 aggregate.

17.2    EPC Contractor's Pollution Liability Insurance. EPC Contractor shall maintain contractor's pollution liability insurance [claims made form] in the amount of $5,000,000 each occurrence and in the aggregate.

17.3    Builder's Risk Insurance.

(a)    Owner shall purchase and maintain in force builder's risk insurance for the entire Work. Such insurance shall be written in an amount at least equal to [$250 million] as well as subsequent modifications of that sum. The insurance shall apply on a replacement cost basis.

(b)    The insurance as provided in this paragraph shall name EPC Contractor as additional insured. The insurance as required in this Paragraph shall cover the entire Work at the Project site, and shall also cover portions of the Work located away from the site but intended for use at the site, and shall also cover portions of the Work in transit.

(c)    The insurance as provided in this paragraph shall include business interruption coverage from a delay due to an insured peril.

(d)    The deductible or self-insured retention applicable to the insurance purchased in compliance with this Paragraph shall be paid by Owner. Provided however, if EPC Contractor causes loss covered by this Paragraph, EPC Contractor shall pay the first one hundred thousand dollars ($100,000.00) of the deductible or self-insured retention.

17.4    No Representation of Coverage Adequacy. By requiring the insurance as set out in this Article 16, Owner does not represent that coverage and limits will necessarily be adequate to protect EPC Contractor, and such coverage and limits shall not be deemed as a limitation on EPC Contractor's liability under the indemnities provided to Owner in this Agreement, or any other provision of the Contract Documents.

17.5    Additional Insureds. Any insurance required to be maintained by EPC Contractor pursuant to this Article 16 shall include Owner, including its affiliates, agents, officers, directors,

23

employees, successors and assigns as "Additional Insureds", but solely with respect to liability arising out of the Work.

17.6    Primary Insurance. Any insurance required to be maintained by EPC Contractor pursuant to this Article 16 shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to, or maintained by, Owner or any of the other Additional Insureds.

17.7    Cross-Liability Coverage. If EPC Contractor's liability policies do not contain the standard ISO separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage.

17.8    Evidence of Insurance. Prior to commencing the Work, EPC Contractor shall furnish evidence of its insurance showing compliance with the insurance requirements set forth above.

    (a)    All certificates shall provide for 30 days written notice to Owner prior to the cancellation or material change of any insurance referred to therein.

    (b)    Failure of Owner to demand such certificate or other evidence of full compliance with these insurance requirements or failure of Owner to identify a deficiency from evidence that is provided shall not be construed as a waiver of EPC Contractor's obligation to maintain such insurance.

    (c)    Owner shall have the right, but not the obligation, to prohibit EPC Contractor or any Subcontractor from entering the Project site until such certificates or other evidence that insurance has been placed in complete compliance with these requirements is received and approved by Owner.

    (d)    Failure to maintain the insurance required in this Article 17 may result in termination of this Agreement at Owner's option. If EPC Contractor fails to maintain the insurance as set forth herein, Owner shall have the right, but not the obligation, to purchase said insurance at EPC Contractor's expense, after a reasonable period in which the EPC Contractor has failed to comply.

    (e)    With respect to insurance maintained after final payment in compliance with a requirement above, an additional certificate(s) evidencing such coverage shall be promptly provided to Owner when requested.

17.9    Subcontractors' Insurance. EPC Contractor shall cause each Subcontractor employed by EPC Contractor to purchase and maintain applicable insurance of the type specified in this Article 16. Unless otherwise agreed to in writing by Owner, EPC Contractor will require Subcontractors to obtain the insurance specified in this Article consistent with their work obligations with minimum limits of $5,000,000 per occurrence and in the aggregate, unless an

exception is approved in writing by the Owner. When requested by Owner, EPC Contractor shall furnish to Owner copies of certificates of insurance evidencing coverage for each Subcontractor.

17.10 Professional Liability Insurance. EPC Contractor shall maintain professional liability coverage, including pollution coverage, insuring EPC Contractor and its Subcontractors for negligent acts, errors or omissions arising out of the performance of any design services or functions under the Agreement. The limits of liability under this professional liability coverage shall be $20 million. The coverage or policy shall be maintained for five years after completion of the contract. Coverage shall include a professional services contractual liability coverage endorsement. Coverage shall be primary, and shall be non-contributing with any insurance which may be maintained by Owner or any affiliated companies.

17.11 Costs of Insurance. Any costs relative to the insurance to be provided under this Agreement shall be borne by EPC Contractor, except for Builder's Risk insurance which, if provided by EPC Contractor, shall be provided on a pass-through basis at Owner's cost with no markup.

17.12 Owner's Purchase of Insurance. EPC Contractor shall cooperate with Owner and any and all of Owner's insurance carriers or providers or proposed insurance carriers or providers to provide such information, documentation and assistance necessary to obtain, maintain or collect under any policy of insurance. Any costs incurred by EPC Contractor herein shall be pass-throughs to Owner's account, including but not limited to efficacy insurance.

17.13 Owner-Controlled Insurance Program ("OCIP"). Owner may elect to implement an Owner Controlled Insurance Program ("OCIP"). An OCIP may include general liability, workers compensation and umbrella coverage for the entire Project and all Subcontractors. If Owner elects to implement an OCIP, EPC Contractor and all Subcontractors agree to be included under the OCIP coverage and exclude their own General Liability, Workers Compensation and Umbrella costs from their bids.

## ARTICLE 18
## PARENT COMPANY GUARANTY

18.1 EPC Contractor will provide a guarantee from its parent corporation Science Applications International Corporation, in the form as provided in Exhibit G.

18.2 LSB Industries, Inc. will provide a guaranty to EPC Contractor, in the form as provided in Exhibit H.

## ARTICLE 19
## INDEMNIFICATION AND WAIVER OF CONSEQUENTIAL DAMAGES

19.1 Indemnification by EPC Contractor. EPC Contractor, on behalf of itself, its Subcontractors, their agents, their employees or any entity or person for which EPC Contractor is

25

responsible (collectively "EPC Contractor Indemnitors"), shall fully indemnify, defend, save and hold Owner, Owner's affiliates, the Additional Insureds, their agents, successors, assigns, employees, officers, directors, partners and related entities, (collectively "Owner Indemnitees") harmless from and against all liability, damage, loss, claims, demands, actions and expenses of any nature whatsoever, including, but not limited to reasonable attorney's fees which arise out of or are connected with: (i) any negligent act, error or omission by any EPC Contractor Indemnitor in the performance of this Agreement; (ii) any breach of this Agreement or failure to comply with the Contract Documents; or (iii) the failure of the EPC Contractor Indemnitor to comply with the laws, statutes, ordinances or regulations of any governmental authority; provided, EPC Contractor, on behalf of itself, its Subcontractors, their agents, their employees or any entity or person for which EPC Contractor is or may be responsible shall have no liability to indemnify, defend, save and hold harmless the Owner Indemnitees or any individual constituent thereof from any liability, damage, loss, claims, demands, actions and expenses of any nature whatsoever, including reasonable attorneys' fees, which arise from the negligence or willful misconduct by the Owner Indemnitees collectively or any constituent member of the Owner Indemnitees individually.

19.2    Indemnification by Owner. Owner, on behalf of itself, its contractors, subcontractors, their agents, their employees or any entity or person for which Owner is responsible (collectively "Owner Indemnitors"), shall fully indemnify, defend, save and hold Owner, Owner's affiliates, the Additional Insureds, their agents, successors, assigns, employees, officers, directors, partners and related entities, (collectively "EPC Contractor Indemnitees") harmless from and against all liability, damage, loss, claims, demands, actions and expenses of any nature whatsoever, including, but not limited to reasonable attorney's fees which arise out of or are connected with: (i) any negligent act, error or omission by any Owner Indemnitor in the performance of this Agreement; (ii) any breach of this Agreement or failure to comply with the Contract Documents; or (iii) the failure of the Owner Indemnitor to comply with the laws, statutes, ordinances or regulations of any governmental authority; provided, Owner, on behalf of itself, its contractors, subcontractors, their agents, their employees or any entity or person for which Owner is or may be responsible shall have no liability to indemnify, defend, save and hold harmless the EPC Contractor Indemnitees or any individual constituent thereof from any liability, damage, loss, claims, demands, actions and expenses of any nature whatsoever, including reasonable attorneys' fees, which arise from the negligence or willful misconduct by the EPC Contractor Indemnitees collectively or any constituent member of the EPC Contractor Indemnitees individually.

19.3    Notwithstanding and superseding anything in this Agreement to the contrary, Owner shall indemnify, defend and hold harmless EPC Contractor from any and all environment liabilities (e.g., Hazardous Materials, waste or substance, etc.) arising out of preexisting conditions at the worksite, and shall be responsible for any environmental remediation on the Site arising out of said preexisting conditions, and any costs and liabilities related thereto, provided EPC Contractor promptly advises Owner if and when the EPC Contractor becomes aware of any such environmental condition.

19.4   Neither party shall be liable to the other for indirect, special, punitive, incidental or consequential damages.

19.5   The obligations set forth in this Article 19 shall survive any termination of this Agreement

## ARTICLE 20
## LIMITATION OF LIABILITY

20.1   Limitation of Liability.   The total collective liability of EPC Contractor and EPC Contractor's officers, directors, managers, partners, employees, agents and consultants arising under, in connection with or out of this Agreement, whether in breach of contract, breach of express or implied warranty, negligence, professional errors or omissions, strict liability, or any other legal theory of recovery, shall not exceed four and one half percent (4.5%) of the direct revenues paid to EPC Contractor by the Owner (excluding any revenues paid to third parties by Owner or paid through EPC Contractor acting as Owner's agent) for all variable cost portions of the Work. This limitation of liability amount was mutually negotiated. Owner acknowledges that without its inclusion, EPC Contractor's Fee would have been greater. EPC Contractor is not liable for damages arising from its reliance upon any data, information, specification or other documents pertaining to the Work that are provided by the Owner or third parties providing information on behalf of Owner.

## ARTICLE 21
## RIGHT TO OCCUPY BY OWNER

21.1   Early Occupancy by Owner.   Owner has the right to occupy or use ahead of schedule all or any substantially completed or partially completed portion of the Project or Work when such occupancy and use are in its best interest, notwithstanding the time of completion for all of the Work provided Owner shall be solely responsible for all risk of loss resulting from any occupancy or use of the Project or Work. Owner shall provide general liability and builders risk insurances to cover its occupancy and use and shall be responsible for any losses, claims, expenses or damages incurred by EPC Contractor arising out of Owner's partial occupancy or use. EPC Contractor shall be entitled to an extension of time to the extent EPC Contractor is delayed as a result of any such early occupancy or use.

## ARTICLE 22
## DEFAULT; RIGHT TO TERMINATE OF OWNER

22.1   Event of Default.

(a)   For the purposes of this Agreement, an Event of Default shall be if:

(i)   at any time there shall be filed by or against EPC Contractor in any court a petition in bankruptcy or insolvency or for reorganization or for the

27

appointment of a receiver or trustee of all or a portion of the property of EPC Contractor, and within twenty (20) days from the filing date EPC Contractor fails to secure a discharge; or

    (ii)    EPC Contractor makes an assignment for the benefit of creditors or petitions for or enters into an agreement or arrangement with its creditors; or

    (iii)    EPC Contractor fails to prosecute the Work properly or safely, or fails to complete the Work entirely on or before the Completion Date; or

    (iv)    EPC Contractor fails to make prompt payment to its Subcontractors or for materials or labor used in the Work; or

    (v)    EPC Contractor fails to supply sufficient qualified labor, material and/or equipment so as to complete the Work timely and in accordance with the Contract Documents including, but not limited to the Progress Schedule; or

    (vi)    without limitation, EPC Contractor fails to perform any term, condition or obligation of this Agreement or the Contract Documents.

    (b)    Upon occurrence of an Event of Default, Owner shall give written notice to EPC Contractor. EPC Contractor shall within ten (10) days from receipt of such written notice cure or undertake all reasonable steps to cure such Event of Default and, failing to do so, then Owner shall be permitted to terminate the Agreement and complete the Work by such means as it deems fit. In such case, EPC Contractor shall not be entitled to receive any further payment until the Work is completed. If the unpaid balance of the Fixed Price portion of the Contract Price exceeds the aggregate of (1) the expense of Owner of completing the Fixed Price portion of the Work, including compensation for additional managerial, architectural and administrative services, and (2) the loss and damage of Owner, including attorney's fees and litigation expense associated with the Fixed Price portion of the Work, such excess shall be paid to EPC Contractor. If such expense, loss and damage of Owner exceeds the unpaid balance of the Fixed Price portion of the Contract Price, EPC Contractor shall pay the difference to Owner promptly on demand. Any costs to Owner to complete the Variable Cost portion of the Contract Price shall be to Owner's account and shall not be due from EPC Contractor.

    22.2    Termination for Convenience. Owner may terminate this Agreement for its convenience without cause by giving ten (10) days' prior written notice to EPC Contractor. In the event this Agreement is terminated for convenience by Owner, Owner will pay EPC Contractor for that portion of the Contract Price, less the aggregate of previous payments, allocable to the Work completed by EPC Contractor as of the date of termination. Owner will also reimburse EPC Contractor for all documented costs, including reasonable actual cancellation and demobilization charges, but not including unexpended General Conditions, any loss of its own profits, or profits from its Subcontractors, suppliers, vendors or materialmen, necessarily

incurred by EPC Contractor for organizing and carrying out the stoppage of the Work and paid directly by EPC Contractor.

22.3 Assignment of Contracts. In the event of termination by Owner pursuant to this Article, EPC Contractor shall promptly upon request assign to Owner all or some subcontracts, materials, tools, equipment to be installed under this Agreement, or rental agreements, and any other commitments which Owner, in its sole discretion, chooses to take by assignment. In such event, EPC Contractor shall promptly execute and deliver to Owner written assignments of such commitments and contracts. EPC Contractor shall ensure all agreements with its Subcontractors and suppliers permit such assignment.

22.4 An Event of Default set forth in Section 21.1(a)(iii-vi) shall not be grounds for default of EPC Contractor under any other contracts with Owner.

## ARTICLE 23
## OWNER DEFAULT

23.1 If Owner fails to make payment to EPC Contractor when due, or fails to perform it's obligations set forth in Article 3, above, EPC Contractor shall, after fifteen (15) days notice to Owner to cure, stop all Work until such time as Owner pays all amounts due EPC Contractor, or cures its obligations (all an "Event of Owner Default"). If such failure to pay continues for a period of sixty (60) additional days, or if Owner fails to cure its Article 3 obligations within the cure period, EPC Contractor may terminate this Agreement.

23.2 If EPC Contractor terminates this Agreement due to an Event of Owner Default, EPC Contractor, if not already done so, shall immediately demobilize from the site. Owner shall be responsible to pay EPC Contractor all amounts due under the Agreement for Work performed up to and including the day of termination, plus all reasonable demobilization costs of EPC Contractor, its Subcontractors and vendors, as well as any costs owed by EPC Contractor to its Subcontractors and vendors for termination of agreements of such Subcontractors and vendors.

## ARTICLE 24
## HAZARDOUS MATERIALS COVENANTS

24.1 Hazardous Materials Covenants.

(a) EPC Contractor hereby represents to and for the benefit of Owner that the Project or Project site will not be used or operated in any manner that will result in the storage, use, treatment, manufacture and disposal of any Hazardous Materials (hereinafter defined) upon the Project or Project site or any portion thereof or which will result in Hazardous Materials contamination (hereinafter defined). For purposes hereof, the term "Hazardous Materials" shall mean and refer to (i) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. ' 6901 et. seq.), as amended from time to time, and regulations promulgated thereunder; (ii) any "hazardous

29

substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. ' 9601 et. seq.) ("CERCLA"), as amended from time to time, and regulations promulgated thereunder; (iii) asbestos; (iv) polychlorinated biphenyls; (v) urea formaldehyde; (vi) any substance the presence of which on the premises is prohibited by any applicable environmental laws or regulations including but not limited to, the Hazardous Material Transportation Act, as amended (49 U.S.C. ' 1801, et. seq.), the Toxic Substance Control Act, as amended (15 U.S.C. ' 2601, et. seq.), (hereinafter referred to as "Laws") or by any other legal requirements affecting the Work or the Work site; (vii) petroleum based materials (with the exception of tires affixed to vehicles); (viii) lead, including lead based paints; and (ix) any other substance which is defined as hazardous, toxic, infectious or radioactive by any Laws or by any other legal requirements affecting the Project or Project site. The term "Hazardous Materials Contamination" shall mean and refer to the contamination of the Project or Project site, soil, surface water, ground water, air, or other elements on, or of, the buildings, facilities, soil, surface water, ground water, air, or other elements on, or of, any other property as a result of Hazardous Materials at any time emanating from the Project or Project site.

(b)     In addition to and without limiting the generality of any other provision of this Contract, EPC Contractor shall and hereby does agree to defend, indemnify and hold Owner, its agents, employees, officers, directors, partners and related entities, harmless from and against any and all losses, damages, expenses, fees, claims, demands, causes of action, judgments, costs and liabilities, including, but not limited to, reasonable attorney's fees and costs of litigation, and costs and expenses of response, remedial and corrective work and other clean up activities, arising out of or in the manner connected with (i) the "release" or "threatened release" (as those terms are defined in CERCLA and the rules and regulations promulgated thereunder, as from time to time amended) by EPC Contractor or EPC Contractor's employees, agents, delegees, invitees, licensees, concessionaires, Subcontractors or representatives, of any Hazardous Materials, or (ii) any occurrence of Hazardous Materials Contamination caused by EPC Contractor affecting the Project or Project site. The provisions of this Section shall survive any payment or satisfaction of this Agreement and such provisions shall remain in full force and effect.

## ARTICLE 25
## MISCELLANEOUS

25.1   No Waiver. No consent or waiver, express or implied, by either party to or of any breach or default by the other in the performance of any of its obligations shall be deemed or construed to be a consent or waiver to or of any other breach or default by such party. Neither the silence of Owner nor Owner's failure to complain of any act or failure to act of EPC Contractor or to declare EPC Contractor in default, irrespective of how long such failure continues, shall constitute a waiver of any right of Owner.

25.2     Conflicts.  In the event of any conflict between the terms, conditions, obligations or provisions expressed in this Agreement and any term, condition, obligation or provision in any of the other Contract Documents, the term, condition, obligation or provision of this Agreement shall govern to the extent of the conflict.

25.3     Assignment.  This Agreement shall not be assigned, delegated or transferred in whole or in part by EPC Contractor nor shall EPC Contractor assign any monies due or to become due to it without the prior written consent of Owner. Owner shall be free to assign this Agreement without consent of EPC Contractor, and upon notice thereof and assumption of that Agreement by any such Assignee, EPC Contractor shall perform all of its obligations for such Assignee and Owner shall be released from liability hereunder. Nothing within this Section 23.3, and no assignment by Owner, shall relieve LSB Industries, Inc. from its responsibilities contained within its Parent Guaranty, attached hereto as Exhibit H.

25.4     Governing Law and Forum.  This Agreement is entered into in Arkansas and shall be governed by and construed according to the laws of Arkansas, without regard to Arkansas' law on choice of law or conflict of laws. Any and all disputes arising from or out of this Agreement and/or the Project shall be resolved in a federal or state court of competent jurisdiction in Union County, Arkansas.

25.5     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

25.6     Article and Section Headings.  Article and Section headings and the Table of Contents contained in this Agreement are for ease of reference only and shall not affect the interpretation or meaning of this Agreement.

25.7     Parties in Interest.  This Agreement shall inure to the benefit of and be binding upon the parties, the sureties and their respective successors, assigns and legal representatives.

25.8     Severability.  If any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but it shall be construed as if such invalid, illegal or unenforceable provision had never been contained in it.

25.9     Subcontractor Relations Requirements.  By appropriate written agreement, EPC Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor to be bound to EPC Contractor by the obligations, terms and conditions of this Agreement and the Contract Documents, and to assume toward EPC Contractor all the obligations, terms, conditions and responsibilities which EPC Contractor, by this Agreement and these Contract Documents, assumes toward Owner. Each Subcontractor agreement shall preserve and protect the rights of Owner under this Agreement and the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not

31

prejudice the rights of Owner. EPC Contractor shall require each Subcontractor to enter into similar agreements with its Subcontractor. EPC Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of appropriate portions of this Agreement and the Contract Documents to which the Subcontractor will be bound. Subcontractors shall similarly make copies of appropriate portions of this Agreement and the Contract Documents available to their respective sub-Subcontractors.

25.10   Press releases and other public announcements by EPC Contractor or its Subcontractors concerning this Project shall be reviewed and approved by Owner, in writing, prior to their issuance. Written approval shall be a prerequisite to any release or announcement, although approval shall not be unreasonably withheld.

25.11   Notices. All notices, requests, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if hand-delivered, or delivered by any nationally recognized overnight delivery service, or mailed by certified or registered mail, return receipt requested, postage prepaid;

25.12   Dispute Resolution. If a dispute arises out of or relates to this Agreement or its breach, and if the dispute cannot be settled through direct discussions by management representatives of both Parties, the Parties agree that prior to the filing of any legal action, they will first try to settle the dispute by non-binding mediation, using a certified mediator or certified mediation service. The parties shall share the mediation costs including the mediator's fee equally. Failure of the Parties to resolve the dispute through mediation shall in no way remove the right of either Party to pursue any legal action or recourse after the mediation has occurred. Notwithstanding the foregoing, either Party may seek injunctive relief from any court of competent jurisdiction at any time in case of a breach of any term of this Agreement or other cause of action involving risk of imminent and irreparable injury or harm.

(a)   If to Owner, addressed to:

      Mr. Dallas Robinson
      Project Manager
      El Dorado Ammonia L.L.C.
      16 S. Pennsylvania Avenue
      Oklahoma City, OK 73107

With a copy to:

      David Shear
      General Counsel
      El Dorado Ammonia L.L.C.
      16 South Pennsylvania Avenue
      Oklahoma City OK 73107

(b)     If to EPC Contractor, addressed to:

                SAIC Constructors, LLC
                Mr. Michael Smith
                Vice President
                9400 N. Broadway, Ste. 300
                Oklahoma City, OK  73114

      With a copy to:

                Jeffrey W. Miller
                Associate Counsel
                SAIC Constructors, LlC
                9400 N. Broadway, Ste. 300
                Oklahoma City, OK  73114

Owner or EPC Contractor may at any time change the addresses to which copies of notices must be mailed by sending written notice to the other of such change in the manner provided.

25.13   Exhibits.  Any Exhibits described in this Agreement shall be deemed to be incorporated and made a part of this Agreement, except that if there is any inconsistency between this Agreement and the provisions of any Exhibit, the provisions of this Agreement shall control to the extent of the inconsistency.

25.14   Entire Agreement.  This Agreement, together with any Exhibits, the other Documents and the Contract Documents, constitutes the entire agreement between Owner and EPC Contractor and supersedes all prior written or oral agreements, understandings, representations, negotiations and correspondence between the parties.  EPC Contractor and Owner agree and stipulate conclusively that both parties received the benefit of counsel before signing this Agreement, and that both parties participated equally in drafting this Agreement.

25.15   Joint Negotiation.  This Agreement has been negotiated by Owner and EPC Contractor, and this Agreement shall not be deemed to have been negotiated and prepared by Owner or EPC Contractor, but by both equally.

IN WITNESS WHEREOF, the parties have made and executed this Agreement as of the day and year first above written.

EL DORADO AMMONIA L.L.C.

By: _Brian Lewis_

Name: BRIAN LEWIS

Title: V.P.

SAIC CONSTRUCTORS, LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have made and executed this Agreement as of the day and year first above written.

EL DORADO AMMONIA L.L.C.

By: _____
Name: _____
Title: _____

SAIC CONSTRUCTORS, LLC

By: _____
Name: _____
Title: _____

**Exhibit A**
**Scope of Work**

The Scope of Work (SOW) is addressed in the following sequence.

| Section | Description |
|---------|-------------|
|         | Overview and Assumptions |
| A       | EPC Services |
| B       | Engineering |
| C       | Construction Management |
|         |   -Safety Management |
|         |   -Procurement |
|         |   -Cost Controls / Accounting |
|         |   -Scheduling |
|         |   -Estimating |
|         |   -Invoicing |
|         |   -Testing & Inspections |
|         |   -Commissioning and Startup |
|         |   -Final Documentation |
| D       | Clarifications |
| E       | Equipment List |

**Overview and Assumptions**

This Scope of Work (SOW) covers the reassembly of the 531-NH3 ammonia plant at the El Dorado Chemical Company located in El Dorado, AR ("Project") for El Dorado Ammonia L.L.C. ("Owner"). This SOW is specific to the ISBL (In Side Battery Limits) for this relocated/reassembled ammonia plant, and details EPC Contractor's total efforts for the reassembly of a relocated Ammonia plant. In addition, this SOW includes engineering and construction of OSBL (Out Side Battery Limits") systems and equipment identified as numbers 188 (ammonia cooling tower), 189 (demineralized water system), and 190 (30,000 ton ammonia storage tank) in Section E of this SOW (collectively "OSBL Systems").

Said plant was located in Donaldsonville, LA and will be identified herein as Unit No. 531-NH3 ("531-NH3"). Said plant has been dismantled and shipped by Owner, and will be reassembled at Owner's Site at 4500 N. West Ave, El Dorado, AR by EPC Contractor. 531-NH3 will be reassembled in the same physical arrangement as it was in its original location, unless otherwise specified herein. Process equipment will be set up on the same centerlines and elevations to allow the maximum reuse of piping and interconnections, as inspected by others as set forth herein.

The original plant, owned by Triad, was designed and constructed in 1969 by M. W. Kellogg (MWK). The Owner purchased 531-NH3 and relocated it to its facility in El Dorado, AR. The purchase of the 531-NH3 included the engineering documentation and maintenance records. These documents (65 banker boxes) have been scanned to electronic files (PDF's). These records will become part of the permanent record for this process unit.

## A. EPC Services

EPC Contractor shall provide EPC services for the 531-NH3 rebuild and OSBL Systems. EPC Contractor shall be responsible for the engineering, construction, subcontractor and equipment procurement, cost controls and accounting, scheduling, estimating, invoicing, mechanical integrity, construction inspections, commissioning and startup support, and final documentation necessary to reassemble 531-NH3 at the Site and the OSBL Systems.

EPC Contractor shall monitor Project progress on a continuous and ongoing basis. EPC Contractor shall conduct weekly telephone meetings with Owner to discuss Project status and any Owner concerns. EPC Contractor will issue monthly progress reports for the duration of the Project which will generally follow the format below:

      Executive Summary
      Safety Summary
      Engineering accomplishments, upcoming activities and issues
      Procurement accomplishments, upcoming activities and issues
      Construction accomplishments, upcoming activities and issues
      Graphical EPC Progress Curve(s)
      EPC Schedule updates
      Identification of scope changes and change orders

Cost report and forecast

## B. Engineering

Owner has provided EPC Contractor with historical documentation from the Triad Donaldson plant (MWK Basis). EPC Contractor has no responsibility for the MWK Basis, and shall rely on such historical documentation and documentation produced by EPC Contractor in the course of the Project, to assist Owner in the development of Owner's Process Safety Management (PSM) files.

EPC Contractor shall create new engineering documents for foundations, structural steel, electrical and instrumentation and will follow EPC Contractor standard specifications, formats, pipe line numbers and other similar protocols with the incorporation of applicable Owner review comments. EPC Contractor shall not be responsible for the 531-NH3 process or process design, and will rely upon and reuse the process engineering and mechanical engineering from the MWK Basis. By way of example, EPC Contractor shall utilize the existing piping isometric drawings from the MWK Basis. These will be published in Adobe Acrobat PDF format. The reuse of the existing documents is a significant savings in the cost of engineering. This savings has been taken into account in the proposed engineering budgets.

The following is a list of the engineering and documentation deliverables:

   a. Foundation design calculations and drawings

   b. Structural design calculations and drawings

   c. Mechanical and piping design and drawings

      i. Tie in list
      ii. Piping plans and elevations (reuse MWK Basis)
      iii. Isometric drawings (reuse MWK Basis)
      iv. Piping stress analysis (Not included in this SOW. To be added after risk definition is provided.)
      v. Line list
      vi. Drawing list

   d. Electrical design and drawings

      i. One Line Diagrams
      ii. Area Classification Plan
      iii. Grounding Plans
      iv. Lighting Plans
      v. Power Distribution Plans
      vi. Conduit and cable schedule
      vii. Conduit and cable routing

3

e.  Instrumentation design and drawings

    i.     Instrument specification
    ii.    Instrument location plans
    iii.   Wiring Diagrams
    iv.   Conduit and cable schedule
    v.    Conduit and cable routing
    vi.   Junction box Details
    vii.   Loop Diagrams
    viii.  Instrument Index
    ix.   Instrument Installation Details
    x.    Control valve repair specifications
    xi.   Relief valve repair specifications
    xii.   Distributed Control System (DCS) vendor RFQ and bid evaluation and recommendation.
    xiii.  Coordinate with DCS vendor during detail design.

f.  Electronically integrate and assemble the equipment data books to be compiled from the MWK Basis, documents provided by Owner, or others on behalf of Owner, and EPC Contractor.

g.  Note that an Operating Manual is not included. Standard manuals provided by vendors for new equipment will be provided.

## C. <u>Construction</u>

EPC Contractor shall, through its employees or through others, be responsible for and coordinate all construction activities for the 531-NH3 Project. EPC Contractor site construction activities will include the following items:

    Site preparation
    Laydown and material staging
    Material deliveries and unloading
    Equipment deliveries and unloading
    Excavation and soil preparation
    Foundations and paving
    Structural Steel Assembly
    Equipment lifting, setting and alignments
    Piping Installation
    Electrical Power and Lighting
    Instrumentation Conduit and wiring
    Instrumentation Device Installation and Testing
    Equipment Insulation
    Piping Insulation and tracing

**Safety Management** - Within 30 days of contract execution, EPC Contractor will develop a site specific Health and Safety Program for the El Dorado Expansion Program which includes this Scope of Work.

**Procurement** - EPC Contractor will develop and execute a project Procurement Management Plan (PMP). This PMP will identify all Project equipment/system and material purchase requirements and established detailed execution timeline for effective integration and completion within the established EPC Schedule.

Procurement will follow a consistent work flow from assembly of scope and material requirements, pre-qualification of bidders, RFQ bid tab and ultimate vendor/subcontract selections. EPC Contractor will collaborate with Owner as necessary for all major equipment/system and subcontract procurement activities.

**Cost Control Accounting** - EPC Contractor will provide cost control services for the reassembly of the 531-NH3 Project, for the Variable Cost Portion of the Work. Cost tracking will be provided in required categories with phase, task and Project specific codes.

**Schedule** – Within 30 days of contract execution, EPC Contractor will provide a detailed project schedule for the reassembly of the 531-NH3 Project.

**Estimating** - EPC Contractor will provide estimating services for the reassembly of the 531-NH3 Project. This effort will provide fair and reasonable evaluations of subcontractor's bids and change orders.

**Testing & Inspections** - EPC Contractor shall provide full time quality program management for construction activities. This quality program management will monitor compliance with specifications and standards as detailed in the quality control program and construction test plan which will be developed within 90 days of contract execution.

**Commissioning and Start up** - EPC Contractor will provide craft labor in support of Owner's operational start up and commissioning of the Plant. Said support shall be provided as budgeted and set forth in Exhibit D, and shall not exceed three (3) months in total duration in compliance with the EPC Schedule.

**Final Documentation** - The final record of engineering and construction details will be provided to the Owner as set forth in the Agreement. These records will become the basis for implementation of the Owner's PSM program.

### D. Clarifications

1. Only process equipment specifically shown on PFD's and Process Design Basis included in the SOW are included.
2. Owner is responsible for performing all test runs, stream analysis, system start-up and/or any other chemical testing.
3. Owner is responsible for providing the initial charges of chemicals and lubricants.

4. Inspection, Design and/or modification of any existing and/or Owner-Furnished Equipment or structures, is not included unless specifically denoted.

5. Piping of 3" diameter and greater is part of the relocation plan and will be inspected by others within the control of Owner prior to reuse, or replaced by EPC Contractor if it does not pass inspection. Piping that is less than 3" diameter will be purchased new by EPC Contractor.

6. Existing structures which require additional loading by this Project will be identified, checked, engineered and modified as required by EPC Contractor. If not identified as significantly loaded, EPC Contractor presumes existing design is adequate to accommodate loads.

7. One preliminary general Operation/Constructability Review and two (2) HAZOP/LOPA Reviews will be conducted and take place within the prescribed Schedule. EPC Contractor will support the Owner HAZOP/LOPA Reviews with one Process Engineer and one Instrument Engineer for two days each.

8. Any changes made as a result of HAZOP/LOPA reviews shall be subject to Article 9 of the Agreement.

9. Isometric drawings for steam trace tubing are not included.

10. Relocation of any underground or overhead lines or obstructions is not included.

11. Deluge system or any other fire protection systems are not included. Lube oil consoles, major machines, fire monitoring and deluge systems are available upon request by Owner, as an additional service.

12. Auxiliary systems (if required) such as programmable logic controllers (PLC) associated with specific pieces of equipment within the unit(s) will communicate to the DCS via a data highway communication link.

13. Available onsite disposal of excavation spoil materials and concrete rubble shall be the responsibility of Owner.

14. Project work will be conducted on a five (5) day construction work week not to exceed 50 hours per week. Additional costs, including overtime resulting from Owner requested schedule changes and/or acceleration, are not included.

15. Owner will provide one Work Permit per Work Area to cover a full 10 hour construction work day. EPC Contractor shall have the right to seek recovery of any additional costs and or schedule adjustments caused by Owner's delay in issuing the daily Work Permit, or for any unscheduled evacuations of the Site.

16. Control system programming and hardware is not included. ALL programming integration will be in the scope of the DCS vendor.

17. Validation of existing engineering, design, calculations, piping, equipment, material sizes and capacities for relocated items is not included.

18. 3D modeling of piping and equipment is available upon request by Owner, as an additional service.

19. EPC Contractor has no responsibility for the operation or output or performance of the Plant, except the OSBL Systems, and to the extent that EPC Contractor a) modifies, adds to or replaces original equipment of the 531-NH3 as delivered to the Site by Owner, or b) designs or engineers systems or equipment.

## E. EQUIPMENT LIST

Kellogg Ammonia Equipment List                                Rev D              7/11/2013

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|---|---|---|---|---|---|
| 1 | 101-B | PRIMARY REFORMER | Owner | BD Energy | |
| 2 | 102-B | STARTUP HEATER | Owner | BD Energy | |
| 3 | 101-D | DESULFERIZER NO. 1 | Owner | D'ville | F |
| 4 | 102-D | DESULFERIZER NO. 2 | Owner | D'ville | F |
| 5 | 103-D | SECONDARY REFORMER | Owner | D'ville | F |
| 6 | 104-D | SHIFT CONVERTER | Owner | D'ville | F |
| 7 | 104-DG | LT SHIFT GUARD | Owner | D'ville | F |
| 8 | 105-D | SYNTHESIS CONVERTER | Owner | D'ville | F |
| 9 | 106-D | METHANATOR | Owner | D'ville | F |
| 10 | 107-D | TRANSFER LINE (101-B TO 102-D) | Owner | D'ville | F |
| 11 | 110-DA | SYN. GAS DRYERS | Owner | D'ville | F |
| 12 | 110-DB | SYN. GAS DRYERS | Owner | D'ville | F |
| 13 | 111-D | SYN. GAS PREDRYER | Owner | D'ville | F |
| 14 | 400-D | FUEL GAS DESULPHURISER | Owner | D'ville | F |
| 15 | 101-E | CO2 ABSORBER | Owner | D'ville | F |
| 16 | 102-EA | CO2 STRIPPER | Owner | D'ville | F |
| 17 | 102-EB | CO2 STRIPPER | Owner | D'ville | F |
| 18 | 103-E | PROCESS CONDENSATE STRIPPER | Owner | D'ville | F |
| 19 | E-101 | H.P. PURGE ABSORBER | Owner | D'ville | F |
| 20 | E-104 | L.P. PURGE ABSORBER | Owner | D'ville | F |
| 21 | E-108 | AMMONIA STRIPPER | Owner | D'ville | F |
| 22 | 101-CA | PRIMARY WASTE HEAT BOILER A | Owner | COF | |
| 23 | 101-CB | PRIMARY WASTE HEAT BOILER B | Owner | COF | |
| 24 | 101-C-S | PRIMARY WASTE HEAT BOILER - SPARE | Owner | COF | |
| 25 | 101-C | AUX. FUEL GAS COOLER (C-101) | Owner | D'ville | F |
| 26 | 101-JC | SURFACE CONDENSER | Owner | D'ville | F |

7

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|-------|---------|-------------|--------------|--------|-------|
| 27 | 102-JC | PARALLEL SURFACE CONDENSER | Owner | D'ville | F |
| 28 | 102-C | SECONDARY WASTE HEAT BOILER | Owner | COF | |
| 29 | 103-C | PRIMARY SHIFT EFFLUENT WASTE HEAT BOILER | Owner | D'ville | F |
| 30 | 104-C | METHANATOR FEED HEATER | Owner | D'ville | F |
| 31 | 105-CA | CO2 STRIPPER REBOILER, A | Owner | D'ville | F |
| 32 | 105-CB | CO2 STRIPPER REBOILER, B | Owner | D'ville | F |
| 33 | 106-C | SHIFT EFFLUENT BFW HEATER | Owner | TBD | A |
| 34 | 108-CA1 | MEA SOLUTION COOLER | Owner | D'ville | F |
| 35 | 108-CB1 | MEA SOLUTION COOLER | Owner | D'ville | F |
| 36 | 108-CA2 | MEA SOLUTION COOLER | Owner | D'ville | F |
| 37 | 108-CB2 | MEA SOLUTION COOLER | Owner | D'ville | F |
| 38 | 109-CA1 | MEA SOLUTION EXCHANGER | Owner | D'ville | F |
| 39 | 109-CB1 | MEA SOLUTION EXCHANGER | Owner | D'ville | F |
| 40 | 109-CA2 | MEA SOLUTION EXCHANGER | Owner | D'ville | F |
| 41 | 109-CB2 | MEA SOLUTION EXCHANGER | Owner | D'ville | F |
| 42 | 110-CA | CO2 STRIPPER CONDENSER, A | Owner | D'ville | F |
| 43 | 110-CB | CO2 STRIPPER CONDENSER, B | Owner | D'ville | F |
| 44 | 111-CA | CO2 STRIPPER STEAM REBOILER, A | Owner | D'ville | F |
| 45 | 111-CB | CO2 STRIPPER STEAM REBOILER, B | Owner | D'ville | F |
| 46 | 112-C | L. T. SHIFT CONVERTER INLET BOILER | Owner | Not Needed | D |
| 47 | 113-C | MEA VAPORIZER | Owner | Not Needed | D |
| 48 | 114-C | METHANATOR EFFLUENT BFW HEATER | Owner | D'ville | F |

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|---|---|---|---|---|---|
| 49 | 115-C | METHANATOR EFFLUENT COOLER | Owner | D'ville | F |
| 50 | 116-C | SYNTHESIS GAS COMPR. INSTERSTAGE COOLER | Owner | TBD | A |
| 51 | 117-C | FEED AND RECYCLE GAS FIRST STAGE CHILLER | Owner | D'ville | F |
| 52 | 118-C | FEED AND RECYCLE SECOND STAGE CHILLER | Owner | D'ville | F |
| 53 | 119-C | FEED AND RECYCLE THIRD STAGE CHILLER | Owner | D'ville | F |
| 54 | 120-C | AMMONIA CONVERTER FEED/FED GAS & RECYCLE EXCH. | Owner | D'ville | F |
| 55 | 121-C | AMMONIA CONVERTER FEED/EFFLUENT EXCHANGER | Owner | TBD | A |
| 56 | 122-C1 | AMMONIA CONVERTER INTERCHANGER (122-C) | Owner | D'ville | F |
| 57 | 123-C1 | AMMONIA CONVERTER BFW EXCHANGER | Owner | D'ville | F |
| 58 | 123-C2 | AMMONIA CONVERTER BFW EXCHANGER | Owner | D'ville | F |
| 59 | 124-C | SYNTHESIS GAS COMPR. AFTERCOOLER | Owner | D'ville | F |
| 60 | 124-C1 | SYNTHESIS GAS COMPR. AFTERCOOLER | Owner | D'ville | F |
| 61 | 125-C | PURGE GAS CHILLER | Owner | D'ville | F |
| 62 | 126-C | FLASH GAS CHILLER | Owner | D'ville | F |
| 63 | 127-CA | REFRIGERANT CONDENSER, A | Owner | TBD | A |
| 64 | 127-CB | REFRIGERANT CONDENSER, B | Owner | TBD | A |
| 65 | 128-C | REFRIGERANT COMPRESSOR INTERCOOLER | Owner | D'ville | F |
| 66 | 129-C | SYN. GAS COMPR. INTERSTAGE CHILLER | Owner | D'ville | F |
| 67 | 129-JC | AIR COMPR. INTERSTAGE COOLER (BY Vendor) | Owner | D'ville | F |

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|---|---|---|---|---|---|
| 68 | 130-JC | AIR COMPR. INTERSTAGE COOLER (BY Vendor) | Owner | D'ville | F |
| 69 | 131-JC | AIR COMPR. INTERSTAGE COOLER (BY Vendor) | Owner | D'ville | F |
| 70 | 134-C | SYN. GAS. RECYCLE COOLER | Owner | D'ville | F |
| 71 | 136-C | SYN. GAS METHANATOR FEED EXCHANGER | Owner | D'ville | F |
| 72 | 147-C | AMMONIA VAPORIZER (by Piping) | Owner | D'ville | F |
| 73 | 150-C | OVERHEAD CONDENSER FOR 103-E | Owner | D'ville | F |
| 74 | 151-C | BOTTOM REBOILER FOR 103-E | Owner | D'ville | F |
| 75 | 152-C | S/U GAS HEATER FOR LT SHIFT CONVERTER | Owner | D'ville | F |
| 76 | 153-C | S/U METHANE COOLER FOR ABSORBER | Owner | D'ville | F |
| 77 | 400-C | SYN. GAS. CHILLER | Owner | D'ville | F |
| 78 | 401-C | STRIPPER GAS CONDENSER | Owner | D'ville | F |
| 79 | 402-C | NG TO PREHEATER & DESULPHURISED NG HEAT EXCHANGER | Owner | D'ville | F |
| 80 | 403-C | NG TO PREHEATER & DESULPHURISED NG HEAT EXCHANGER | Owner | D'ville | F |
| 81 | C-103 | PRISM SEPARATORS FEED HEATER | Owner | D'ville | F |
| 82 | C-105 | AUX PURGE GAS PREHEATER | Owner | Not Needed | D |
| 83 | C-107 | PURGE GAS PREHEATER | Owner | Not Needed | D |
| 84 | C-112 | STRIPPER FEED HEAT EXCHANGER | Owner | D'ville | F |
| 85 | C-116 | OVERHEAD CONDENSER FOR 103-E | Owner | D'ville | F |
| 86 | C-137 | PROCESS WATER COOLER TO 104-E | Owner | D'ville | . F |

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|---|---|---|---|---|---|
| 87 | C-138 | PROCESS WATER HEAT EXCHANGER TO 104-E | Owner | D'ville | F |
| 88 | C-113 | STRIPPER REBOILER | Owner | D'ville | F |
| 89 | 101-F | STEAM DRUM | Owner | D'ville | F |
| 90 | 102-F | RAW GAS SEPARATOR | Owner | TBD | A |
| 91 | 103-F | CO2 STRIPPER REFLUX DRUM | Owner | D'ville | F |
| 92 | 104-F | SYNTHESIS GAS COMPR. SUCTION DRUM | Owner | D'ville | F |
| 93 | 105-F | SYNTHESIS GAS COMPR. FIRST STAGE SEPARATOR | Owner | D'ville | F |
| 94 | 106-F | SECONDARY AMMONIA SEPARATOR | Owner | D'ville | F |
| 95 | 107-F | PRIMARY AMMONIA SEPARATOR | Owner | D'ville | F |
| 96 | 108-F | PURGE SEPARATOR | Owner | D'ville | F |
| 97 | 109-F | REFRIGERANT RECEIVER | Owner | TBD | A |
| 98 | 110-F | FIRST STAGE REFRIGERANT FLASH DRUM | Owner | D'ville | F |
| 99 | 111-F | SECOND STAGE REFRIGERANT FLASH DRUM | Owner | D'ville | F |
| 100 | 112-F | THIRD STAGE REFRIGERANT FLASH DRUM | Owner | D'ville | F |
| 101 | 114-F | MEA STORAGE TANK (with STEAM COIL) [20' D /16'H 37,000GAL] | EPC Contractor | TBD | G |
| 102 | 115-F | MEA SUMP (Pump J-150 Installed Sump) | EPC Contractor | TBD | G |
| 103 | 116-F | ANHYDROUS AMMONIA STORAGE (warm) | Owner | D'ville | F |
| 104 | 117-F | N.G. KNOCK OUT POT | Owner | D'ville | F |
| 105 | 120-F | PROCESS GAS SEPARATOR | Owner | D'ville | F |
| 106 | 141-F | INSTRUMENT AIR RECEIVER | Owner | D'ville | F |
| 107 | 141-FX | AIR RECEIVER | Owner | Not Needed | D |
| 108 | 150-F | CONDENSATE FROM UREA KNOCK OUT POT | Owner | D'ville | F |

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|-------|---------|-------------|--------------|--------|-------|
| 109 | 156-F | BLOW DOWN DRUM | Owner | D'ville | F |
| 110 | 157-F | PROCESS GAS KO DRUM | Owner | D'ville | F |
| 111 | 400-F | KNOCK OUT DRUM FOR 400-C | Owner | D'ville | F |
| 112 | 401-F | CONDENSATE FEED DRUM | Owner | D'ville | F |
| 113 | 402-F | SEPARATOR | Owner | D'ville | F |
| 114 | F-119 | REFLUX ACCUMULATOR FOR STRIPPER E-108 | Owner | D'ville | F |
| 115 | F-120 | AQUA SURGE TANK FOR STRIPPER E-108 | Owner | D'ville | F |
| 116 | F-121 | SUC. DRUM AT J-102 INLET | Owner | D'ville | F |
| 117 | 2002-F | PROCESS CONDENSATE TANK | EPC Contractor | TBD | G |
| 118 | 2004-F | DMW TANK | EPC Contractor | TBD | G |
| 119 | 101-J | AIR COMPRESSOR | Owner | Sulzer | |
| 120 | 101-BJ | I.D. FAN | Owner | BD Energy | |
| 121 | 103-J | SYNTHESIS GAS COMPRESSOR | Owner | Sulzer | |
| 122 | 104-J | H.P. BFW PUMP | Owner | Sulzer | |
| 123 | 104-JA | STANDBY FOR 104-J | Owner | Sulzer | |
| 124 | 105-J | REFRIGERANT COMPRESSOR | Owner | Sulzer | |
| 125 | 106-J | QUENCH PUMP | Owner | | F |
| 126 | 107-JA | MEA CIRC. PUMP, A | Owner | Sulzer | |
| 127 | 107-JB | MEA CIRC. PUMP, B | Owner | Sulzer | |

12

| SR.# | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|------|---------|-------------|--------------|--------|-------|
| 128 | 107-JC | STANDBY FOR 107-JA | Owner | Sulzer | |
| 129 | 107-JD | STANDBY FOR 107JB | Owner | Sulzer | |
| 130 | 107-J1 | MEA SUPPLY PUMP | Owner | Not Needed | D |
| 131 | 108-J | CO2 STRIPPER REFLUX PUMP | Owner | D'ville | F |
| 132 | 108-JA | CO2 STRIPPER REFLUX PUMP (STANDBY FOR 108-J) | Owner | D'ville | F |
| 133 | 108-J1 | PROCESS COND. TO MEA TANK | Owner | Not Needed | D |
| 134 | 111-J | MEA CHARGE PUMP | Owner | D'ville | F |
| 135 | 112-J | CONDENSATE PUMP (for 101-CJ) | Owner | D'ville | F |
| 136 | 112-JA | CONDENSATE PUMP (STANDBY FOR 112-J) | Owner | D'ville | F |
| 137 | 118-J | PRODUCT PUMP | Owner | D'ville | F |
| 138 | 118-JA | PRODUCT PUMP (STANDBY) | Owner | D'ville | F |
| 139 | 119-JA | WARM AMMONIA FROM 116-F | Owner | D'ville | F |
| 140 | 119-JB | WARM AMMONIA FROM 116-F | Owner | D'ville | F |
| 141 | 400-J | PROCESS CONDENSATE FEED PUMP | Owner | D'ville | F |
| 142 | 120-J | AMMONIA INJECTION PUMP | Owner | D'ville | F |
| 143 | 123-J | START UP BOILER FEED WATER PUMP | Owner | D'ville | F |
| 144 | 150-J | MEA SUMP PUMP (installed IN 115-F) | Owner | D'ville | F |
| 145 | J-102 | HP ABSORBER E-101 FEED PUMP | Owner | D'ville | F |
| 146 | J-110 | SCRUBBER E-108 FEED PUMP | Owner | D'ville | F |

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|---|---|---|---|---|---|
| 147 | J-114 | REFLUX TO E-108 | Owner | D'ville | F |
| 148 | J-2004 E/W | DMW SUPPLY PUMPS | Owner | D'ville | F |
| 149 | J-2005 E/M/W | PURIFIED P. COND. PUMPS | Owner | D'ville | F |
| 150 | J-2201 A/B/C | CW SUPPLY PUMPS | N/A | See SR # 186 | |
| 151 | JC-2201 | FUEL GAS EXPANDER | N/A | See SR #186 | |
| 152 | 101-JT | TURBINE FOR 101-J | Owner | Sulzer | |
| 153 | 101-JBT | TURBINE FOR 101-BJ | Owner | BD Energy | |
| 154 | 103-JAT | TOPPING TURBINE FOR 103-J | Owner | Sulzer | |
| 155 | 103-JBT | CONDENSING TURBINE FOR 103-J | Owner | Sulzer | |
| 156 | 104-JT | TURBINE FOR 104-J | Owner | Sulzer | |
| 157 | 104-JAT | TURBINE FOR 104-JA | Owner | Sulzer | |
| 158 | 105-JT | TURBINE FOR 105-J | Owner | D'ville | F |
| 159 | 107-JAT | TURBINE FOR 107-JA | Owner | Sulzer | |
| 160 | 107-JBT | TURBINE FOR 107-JB | Owner | Sulzer | |
| 161 | 112-JAT | TURBINE FOR 112-JA | Owner | D'ville | F |
| 162 | 400-JT | TURBINE FOR 400-J | Owner | D'ville | F |
| 163 | 101-LA/LB | MEA FILTER | Owner | Not Needed | D |
| 164 | 102-L | AIR FILTER | Owner | D'ville | F |
| 165 | 104-LA/LB | S.G. DRYER FINES SEPARATORS | Owner | D'ville | F |

14

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|-------|---------|-------------|--------------|--------|-------|
| 166 | L-104A | HYDROGEN SKID | Owner | D'ville | F |
| 167 | L-104B | HYDROGEN SKID | Owner | D'ville | F |
| 168 | L-104C | HYDROGEN SKID | Owner | D'ville | F |
| 169 | L-104D | HYDROGEN SKID | Owner | D'ville | F |
| 170 | L-104E | HYDROGEN SKID | Owner | D'ville | F |
| 171 | L-104F | HYDROGEN SKID | Owner | D'ville | F |
| 172 | L-104G | HYDROGEN SKID | Owner | D'ville | F |
| 173 | L-106A | HYDROGEN SKID | Owner | D'ville | F |
| 174 | L-106B | HYDROGEN SKID | Owner | D'ville | F |
| 175 | L-106C | HYDROGEN SKID | Owner | D'ville | F |
| 176 | L-106D | HYDROGEN SKID | Owner | D'ville | F |
| 177 | 105-L | MEA PURGE TANK (WITH 105-LJ/105-LL) | Owner | D'ville | F |
| 178 | 106-L E/W | VACUUM OIL PURIFIERS | Owner | D'ville | F |
| 179 | 107-L | MEA AERATON TANK (WITH 107-LJ/107-LL | Owner | Not Needed | D |
| 180 | 108-L | MEA TANK (WITH 108-LJ/108-LL) | Owner | Not Needed | D |
| 181 | 2002-L | PHOSPHATE INJECTION SYTEM (FOR STEAM DRUM) | Owner | D'ville | F |
| 182 | 2003-L | INSTRUMENT AIR DRIER | Owner | D'ville | F |
| 183 | 101-U | DEAERATOR | EPC Contractor | NEW | B |
| 184 | | CONDENSATE POLISHING SYSTEM | EPC Contractor | NEW | B |

15

| SR. # | TAG NO. | DESCRIPTION | FURNISHED BY | SOURCE | NOTES |
|-------|---------|-------------|--------------|--------|-------|
| 185 | | FRONTEND START-UP VENT MUFFLER- FLARE | EPC Contractor | NEW | B |
| 186 | | POTENTIAL CASALE AMMONIA WASH SYSTEM TO REPLACE THE MOL SIEVE DRYING SYSTEM | EPC Contractor | NEW | C |
| 187 | 102-J | PROCESS GAS BOOSTER | Owner | Sulzer | E |
| 188 | BI.01 | AMMONIA COOLING TOWER | EPC Contractor | NEW | B |
| 189 | BI.07 | DEMINERALIZED WATER (EDI OR ION EXCHANGE) | EPC Contractor | NEW | B |
| 190 | BI.16 | AMMONIA STORAGE TANK | EPC Contractor | NEW | B |

| | NOTES |
|---|---|
| A | This piece of equipment will be Replaced in Kind and Quoted by EPC Contractor; Purchase Order by Owner. |
| B | This piece of equipment is part of the new system. EPC Contractor will engineer and construct. EPC Contractor will specify, quote and recommend; Owner will purchase. |
| C | This system is subject AFE review and approval, evaluation engineering and estimating will be performed. If approved, then the work will proceed per note B. |
| D | This equipment item is no longer needed for the NH3 plant operation. The equipment will not be installed. Owner shall control the disposal of the obsolete equipment. |
| E | This equipment is required for the operation of the NH3 plant. EPC Contractor to provide engineering to determine proper sizing and/or flow rates. Equipment PO by Owner. |
| F | This Equipment shall be subject to inspection by a qualified 3rd Party, and repaired as necessary, under Owner's purchase orders to qualified subcontractors. Coordination by EPC Contractor. |
| G | This piece of equipment is part of the new system. EPC Contractor will engineer and construct. EPC Contractor will specify, quote and recommend; EPC Contractor will purchase. |

16

## Exhibit B

## General Conditions and Engineering Services Fixed Price

1.     The Fixed Price will include all engineering, design, commissioning services and all costs associated with the personnel and indirect support facilities required to manage the execution of the Project and further defined as General Conditions and Engineering.

2.     SAIC shall be paid a fixed lump sum amount for the above (the "Fixed Price") of $16,649,631 (sixteen million six hundred forty nine thousand six hundred thirty one), which represents the Engineering Fee of $10,255,869 (ten million two hundred fifty five thousand eight hundred sixty nine) and the General Conditions cost of $6,393,762 (six million three hundred ninety three thousand seven hundred sixty two). Said Fixed Price shall only be increased through the change order process as detailed in the Agreement. Both categories will be billed monthly based on progress of the associated activity.

3.     The Engineering fixed cost shall include amounts paid by Owner and Owner's affiliates for such services up through the Effective Date ("Pre-paid Engineering"). As of the Effective Date such paid and incurred Pre-paid Engineering total $1,436,067.00, so that the remaining fee for Engineering equals $8,819,802.00 as of the Effective Date. Said Pre-paid Engineering shall be set forth on EPC Contractor's first invoice to Owner under this Agreement as a credit to the Engineering portion of the invoice.

4.     The General Conditions cost shall include amounts paid by Owner and Owner's affiliates for such services and expenses up through the Effective Date ("Pre-paid General Conditions"). As of the Effective Date such paid and incurred Pre-paid General Conditions total $15,946, so that the remaining fee for General Conditions equals $6,377,816 as of the Effective Date. Said Pre-paid General Conditions shall be set forth on EPC Contractor's first invoice to Owner under this Agreement as a credit to the General Conditions portion of the invoice.

5.     The fixed lump sum amounts listed in Paragraph 2 above are contingent upon EPC Contractor being awarded the concurrent work at the Site, commonly referred to as the Nitric Acid Plant, Plinke Unit and associated/supporting Outside Battery Limits infrastructure. Should the referenced work (except a potential Waste Steam Generation Unit) not proceed on the concurrent schedule as detailed in Exhibit E, not be awarded to EPC Contractor or if awarded, suffer significant scope reduction, the above values may be subject to change as described in Article 9 of the Agreement.

## Exhibit C

### Construction Costs/Pass-Through + 4.5%

1.    Contractor's Fee.  For the performance of the Work, EPC Contractor shall be paid the Cost of the Work, plus a fee of four and one half percent (4.5%) of the Cost of the Work (the "Contractor's Fee").

2.    Cost of the Work.  As used herein, the term "Cost of the Work" shall mean the following actual costs necessarily and reasonably incurred by EPC Contractor in the performance of the Work.·

    (a)    Payments made by EPC Contractor directly to subcontractors, vendors, consultants or suppliers for labor, equipment and materials, including any per diem, payroll taxes, transportation charges and sales tax required by law to be paid in connection therewith, furnished by EPC Contractor and to be incorporated into the Plant;

    (b)    Reasonable rental and transportation cost of construction machinery, equipment and tools (excluding hand tools customarily provided by workers) rented from third parties and used at the Site for the Work, provided EPC Contractor receives, where possible, competitive bids for such equipment; or the reasonable rental cost of such machinery, equipment and tools belonging to EPC Contractor but only if approved in writing in advance by Owner.  The rental of any such machinery, equipment and tools shall cease after the use thereof is no longer necessary for the Work;

    (c)    Fees and assessments for permits, licenses and inspections for the Work which EPC Contractor is required to pay by the Contract Documents by reason of such Work;

    (d)    Fees of testing laboratories for tests required by the Contract Documents for the Work less amounts for testing expenses related to Defective Work; and

    (e)    Certain premiums for the insurance specified in Article 16 of the Agreement.

Owner acknowledges that EPC Contractor's budget for the Cost of Work, as set forth in Exhibit D, is merely an estimate and subject to change.

**Exhibit D**
**Estimated Contract Price**



**SAIC**

LSB Industries
16 S Pennsylvania Ave
Oklahoma City, OK 73107

Cumulative Cash Flow

| Month | 531-NH3 |
|-------|---------|
| 1 | 478,875 |
| 2 | 1,027,246 |
| 3 | 2,223,839 |
| 4 | 4,274,503 |
| 5 | 6,687,154 |
| 6 | 8,951,758 |
| 7 | 11,157,267 |
| 8 | 13,402,011 |
| 9 | 15,355,469 |
| 10 | 17,281,862 |
| 11 | 19,195,181 |
| 12 | 21,740,341 |
| 13 | 24,153,019 |
| 14 | 25,667,165 |
| 15 | 28,230,737 |
| 16 | 31,861,532 |
| 17 | 38,921,608 |
| 18 | 44,722,391 |
| 19 | 54,155,992 |
| 20 | 65,853,065 |
| 21 | 79,346,597 |
| 22 | 92,595,699 |
| 23 | 102,924,864 |
| 24 | 109,538,674 |
| 25 | 113,248,143 |
| 26 | 115,300,592 |
| 27 | 116,946,331 |
| 28 | 117,836,183 |
| 29 | 118,089,273 |
| 30 | 118,263,937 |
| 31 | 118,263,937 |

## Cumulative Cash Flow

**Exhibit E**
**Project Schedule**



**SAIC**

El Dorado Ammonia, LLC
16 S Pennsylvania Ave
Oklahoma City, Ok 73107

**Schedule of Values**
Project # 53 NH3
Project NH3 (ISBL)
SOV Date 5/6/2013

| Task | Title | Original Budget | Changes To Date | Revised Budget | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|---|---|
| 1 | NH3 Cooling Tower & Pumps | 5,897,500 | | 5,897,500 | | | | |
| 5 | NH3 BFW System including deaerator | 366,760 | | 366,760 | | | | |
| 7 | NH3 EDI Package Skids | 667,184 | | 667,184 | | | | |
| 8 | Demin Water Storage Tanks | 1,385,036 | | 1,385,036 | | | | |
| 16 | Cryogenic Ammonia Storage w/ Flare | 23,176,907 | | 23,176,907 | | | | |
| 22 | Combended Scope of Work | 181,515 | | 181,515 | | | | |
| 25 | Taxes | 4,688,940 | | 4,888,940 | | | | |
| 38 01 | Equipment | 2,617,068 | | 2,617,086 | | | | |
| 38 02 | Catalyst Install and Luce | 185,300 | | 185,300 | | | | |
| 38 03 | Other | 3,500,000 | | 3,500,000 | | | | |
| 38 04 | Mechanical | 19,098,929 | | 19,098,929 | | | | |
| 38 05 | Ducting | 750,000 | | 750,000 | | | | |
| 38 06 | Steam Blow | 500,000 | | 500,000 | | | | |
| 38 07 | Insulation | 2,263,036 | | 2,263,036 | | | | |
| 38 08 | Paint | 148,149 | | 148,149 | | | | |
| 38 09 | Electrical | 2,390,203 | | 2,390,203 | | | | |
| 38.1 | Instruments | 9,587,435 | | 9,587,435 | | | | |
| 38 11 | R/E Building(s) | 1,250,000 | | 1,250,000 | | | | |
| 38 12 | Civil/Structural Concrete | 2,587,874 | | 2,587,874 | | | | |
| 38 13 | Area Paving | 1,281,481 | | 1,281,481 | | | | |
| 38 14 | Steel | 3,063,845 | | 3,063,845 | | | | |
| 38.15 | Buildings / Architectural | 3,404,430 | | 3,404,430 | | | | |
| 38 16 | Scaffolding | 693,300 | | 693,300 | | | | |
| 38 17 | Equipment Rental | 2,573,200 | | 2,573,200 | | | | |
| 38 18 | Other Freight | 3,502,500 | | 3,502,500 | | | | |
| 38.19 | Start-up, Commissioning | 685,988 | | 685,988 | | | | |
| 30 | Other OC Moved from GC's | 843,800 | | 843,800 | | | | |
| GC | General Conditions | 6,393,782 | | 6,393,782 | | | | |
| OH&P | Overhead & Profit | 4,375,736 | | 4,375,736 | | | | |
| Eng | Engineering | 10,255,869 | | 10,255,869 | | | | |
| **Total** | | **118,263,937** | **0** | **118,263,937** | **0** | **0** | **0** | **0** |
| **Cumulative Total** | | | | | **0** | **0** | **0** | **0** |

Additional LSB Direct Costs

| | |
|---|---|
| Contingency | 31,909,146 |
| NH3 Direct Costs | 66,303,413 |
| LSB Sunk Cost | 17,344,548 |
| CEMS | |
| Process Programming | |
| Import Duties | |
| **Total All AFE Budgets** | **233,821,044** |

| | | | | Month 1 | Month 2 | Month 3 | Month 4 |
|---|---|---|---|---|---|---|---|
| **Cash Flow Basis** | 100 0% | | | 0.4% | 0.5% | 1.0% | 1.5% |
| **Anticipated Cash Flow** | 118,263,937 | | | 476,975 | 546,371 | 1,188,583 | 2,050,664 |
| **Anticipated Cumulative Cash Flow** | 118,263,937 | | | 478,975 | 1,027,346 | 2,223,839 | 4,274,503 |



agrmnt\edam\SAIC Engineering Procurement & Construction Services 2013 - Project Schedule Exhibit

**Exhibit F**
**Change Order Form**

# SAIC

**CHANGE ORDER**

Client: **El Dorado Ammonia, LLC**

Contact: **Dallas Robinson**

Facility: **U-531-NH3**

Change Order Number: **XXX**

Date: **0/00/20xx**

Revision: **0**

Project No: **XXX**

**Description of Work Scope Change:**

Perform the Fixed (Engineering, Procurement and Construction Management) and Reimbursable (Material, Equipment and Subcontract) Cost Services required to incorporate XXXXXXXX.

Reference the attached Client Scope Directions issued on XX/XX/20XX.

---

We have reviewed the above and offer the following estimate for performance of change order scope.

'Fixed' Cost Value: $   -
'Reimbursable' Cost Value: $   -
Total Value of this CO: $   -

Impact to:   Cost ☐   Schedule ☐

Engineering Design Effort

Procurement & Construction

☐ Estimated   ☐ Amount undetermined at this time

☐ Estimated   ☐ Rough Order of Magnitude

☐ Estimated   ☐ Rough Order of Magnitude

---

Please indicate the action to be taken and return this document promptly. Refer to contract Article 8 for process time lines.

☐ Change Order Scope is approved. Proceed with work immediately
☐ Change Order Scope is Rejected. Do not proceed with work
☐ Change Order Scope is not Approved or Rejected. Provide further backup or revise this backup.

Prepared By SAIC Project Controls   _____   Dated: _____
  xxx

Approved By SAIC Project Manager   _____   Dated: _____
  xxx

Approved By Client Representative   _____   Dated: _____
  xxx

**Exhibit G**
**SAIC Guaranty**

This Parent Guaranty, dated as of _____, 2013 (as amended, supplemented or otherwise modified from time to time, this "Guaranty"), is made and entered into by Science Applications International Corporation, a _____ corporation ("Guarantor"), in favor of El Dorado Ammonia L.L.C., an Oklahoma limited liability corporation ("Beneficiary").

## RECITALS

A.     Beneficiary and SAIC Constructors, LLC ("SAIC"), a subsidiary of Guarantor, have entered into that certain Engineering, Procurement and Construction Contract dated _____, 2013 (collectively, with all Attachments and Appendices and as amended, modified, supplemented, and otherwise in effect as of the date hereof, the "Contract"), pursuant to which and Beneficiary have agreed on the terms and conditions set forth therein for the provision of certain goods and services for the Ammonia project site in El Dorado, Arkansas (the "Project");

B.     Guarantor is the ultimate parent of SAIC;

C.     Guarantor is providing this Guaranty pursuant to the Contract; and

D.     Guarantor acknowledges that it will benefit from the transactions contemplated under the Contract.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

## ARTICLE 1
## DEFINITIONS

SECTION 1.01        Definitions.

"Beneficiary" has the meaning given in the preamble hereof.

"Contract" has the meaning given in Recital A hereof.

"Guaranteed Obligations" has the meaning given in Section 2.01 hereof.

"Guarantor" has the meaning given in the preamble hereof.

"Guaranty" has the meaning given in the preamble hereof.

"Project" has the meaning given in Recital A hereof.

## ARTICLE 2
## THE GUARANTY

SECTION 2.01      The Guaranty.  Guarantor, as primary obligor and not merely as surety, hereby unconditionally, absolutely, and irrevocably guarantees to Beneficiary all obligations of SAIC under the Contract, including the full and timely performance to Beneficiary under the Contract (the "Guaranteed Obligations").  Beneficiary shall have no right to make a claim pursuant to this Guaranty unless and until an uncured default has occurred with respect to SAIC's obligations under the Contract.

SECTION 2.02      Performance of Guaranteed Obligations.  Guarantor agrees, upon the failure of SAIC to perform any of the Guaranteed Obligations when they become due and after the expiration of any applicable cure periods set forth in the Contract, that Guarantor will pay, or cause to be paid, or perform, or cause to perform, any and all Guaranteed Obligations upon receipt of written notice from a duly authorized officer of Beneficiary specifying such failure of SAIC.

SECTION 2.03      Subsequent Recovery.  If, in connection with any payment by Guarantor of the Guaranteed Obligations, Beneficiary shall finally recover any such amounts from any other source directly making payments with respect to the Guaranteed Obligations, or it shall be finally determined that such Guaranteed Obligations were not owed to Beneficiary, Beneficiary shall promptly remit such amounts to Guarantor.

SECTION 2.04      Exercise of Remedies.  This Guaranty constitutes a guaranty of performance and payment and not of collection, and the obligations of Guarantor under this Guaranty are primary obligations of Guarantor, and a separate action or actions may be brought and prosecuted against Guarantor to enforce this Guaranty, irrespective of whether any action is brought against SAIC or any other guarantor or whether SAIC or any other guarantor is joined in such action or actions.

SECTION 2.05      Insolvency.  The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, or other proceeding affecting SAIC or the disaffirmance of the Contract in any such proceeding shall not release or discharge Guarantor from this Guaranty.

SECTION 2.06      Waiver; Consent.

(a)      Guarantor hereby unconditionally and irrevocably waives diligence, presentment, demand for payment, protest, the benefit of any discharge due to any disability of SAIC, and all notices whatsoever in respect of the Guaranteed Obligations, this Guaranty, and any and all rights to require Beneficiary to exhaust any right, power or remedy or proceed against SAIC under the Contract.

(b)      Guarantor warrants and agrees that each of the waivers and consents set forth in this Guaranty are made voluntarily and unconditionally after consultation with legal counsel and with full knowledge of their significance and consequences, with the understanding that events

2

giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which Guarantor otherwise may have against SAIC. If, notwithstanding the intent of the parties that the terms of this Guaranty shall control in any and all circumstances, any such waivers or consents are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

SECTION 2.07     Defenses.     Notwithstanding anything herein to the contrary, Guarantor specifically reserves to itself all rights, counterclaims and other defenses that SAIC is or may be entitled to arising from or out of the Contract, except for any defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of SAIC or the lack of power or authority of SAIC to enter into the Contract and to perform its obligations thereunder.

ARTICLE 3
REPRESENTATIONS

SECTION 3.01     Representations and Warranties.     Guarantor represents and warrants to Beneficiary that as of the date of this Guaranty:

(a)     Organization; Corporate Authority.  Guarantor (i) is a corporation duly organized, validly existing and in good standing under the laws of its state of formation, and (ii) has all requisite corporate power and authority to own its assets and to carry on the business in which it is engaged and to execute, deliver and perform its obligations under this Guaranty.

(b)     Authorization; No Conflicts.  The execution and delivery of this Guaranty and the performance of the obligations hereunder have been duly authorized by all necessary corporate action and do not violate, breach or contravene (i) Guarantor's organizational documents and agreements or (ii) any law or contractual restriction binding on or affecting Guarantor or its properties except where such violation, breach or contravention, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on Guarantor's ability to perform its obligations under this Guaranty.

(c)     Enforceability.  This Guaranty has been duly executed and delivered by Guarantor, and constitutes the legal, valid and binding obligation of Guarantor, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, including concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d)     Required Consents.  All authorizations, consents and approvals of any governmental authority or third party necessary for the execution, delivery or performance by Guarantor of this Guaranty have been obtained and are in full force and effect.

(e)     No Actions.  There are no actions, suits, proceedings or investigations pending or, to the Guarantor's knowledge, threatened in writing against it at law or in equity before any court or before any governmental authority, that individually or in the aggregate could reasonably be

3

expected to have a material adverse effect on the business of the Guarantor or could reasonably be expected to result in an impairment of its ability to perform its obligations under this Guaranty.

## ARTICLE 4
## MISCELLANEOUS

SECTION 4.01      No Waiver.  No failure or delay on the part of Beneficiary to exercise and no delay in exercising, and no course of dealing with respect to, and no delay in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver of such right, remedy, power or privilege nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Beneficiary would otherwise have.

SECTION 4.02      No Consequential or Punitive Damages.  In no event shall Guarantor be liable hereunder to any party for any lost profits, special damages, indirect or consequential damages of any nature whatsoever, whether based on contract or tort, or for any punitive or exemplary damages.

SECTION 4.03      Notices.  All notices and other communications provided for in this Guaranty shall be sent, if practicable, by confirmed telecopy (with hard copy sent on the same day by overnight courier) and, otherwise, by overnight courier service prepaid to a party at its address specified below and shall be deemed effective when received.  A communication shall be addressed, until such time as a party shall have notified the other parties hereto of a change of address:  (a) if to Beneficiary, 16 South Pennsylvania Avenue, Oklahoma City, Oklahoma 73107, Attention: David Shear, and (b) if to Guarantor, 9400 N. Broadway, Suite 300, Oklahoma City, OK 73114; Facsimile: (405) 478-3721, Attention: Legal.

SECTION 4.04      Amendments.  No amendment of any provision of this Guaranty shall be effective unless the same shall be in writing and signed by Guarantor and Beneficiary, such consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 4.05      Benefit, Successors and Assigns.  This Guaranty is for the benefit of and is enforceable by Beneficiary and not for the benefit of or enforceable by any other Person.  This Guaranty shall be binding upon Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of Beneficiary.  This Guaranty and all obligations of Guarantor hereunder to Beneficiary shall be assignable by Guarantor only upon the prior written consent of Beneficiary.  Any such assignee shall assume all of the obligations hereunder from and after the effective date of such assignment and in connection therewith, Guarantor shall be released from all obligations hereunder other than any obligations arising from acts or events that occurred prior to the date of such assignment.

SECTION 4.06      Headings.  The Article and Section headings in this Guaranty are for convenience only and shall not affect the construction of this Guaranty.

4

SECTION 4.07      Counterparts.  This Guaranty may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute the same instrument.  Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or "pdf" electronically imaged transmission shall be effective as delivery of a manually executed counterpart of this Guaranty.

SECTION 4.08      Severability.  In case any one or more provisions contained in this Guaranty or obligation under this Guaranty shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or obligations contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

SECTION 4.09      Agreements Superseded.  This Guaranty supersedes all prior agreements and understandings, written or oral, between the parties with respect to the subject matter of this Guaranty.

SECTION 4.10      Governing Law.  This Guaranty shall be governed by and construed in accordance with the laws of the Oklahoma.

SECTION 4.11      Consent to Jurisdiction.  Guarantor hereby irrevocably consents to the non-exclusive personal jurisdiction of the state and federal courts located in Oklahoma City, Oklahoma, and any action, claim or other proceeding arising out of any dispute in connection with this Guaranty or any rights or obligations hereunder or thereunder or the performance of such rights and obligations.  Guarantor hereby irrevocably consents to the service of a summons and complaint and other process in any action, claim or proceeding brought by Beneficiary in connection with this Guaranty or any rights or obligations hereunder or thereunder or the performance of such rights and obligations, on behalf of itself, in the manner specified in Section 4.03 above.  Nothing in this Section 4.11 shall affect the right of Beneficiary to serve legal process in any other manner permitted by applicable law or affect the right of Beneficiary to bring any action or proceeding against Guarantor in the courts of any other jurisdiction.

SECTION 4.12      Termination.  This Guaranty shall terminate and be of no force and effect upon the expiration or satisfaction of all Guaranteed Obligations.

[Remainder of page intentionally blank.]

5

IN WITNESS WHEREOF, the parties have made and executed this Agreement as of the day and year first above written.

EL DORADO AMMONIA L.L.C.

By: _____

Name: BRIAN LEWIS

Title: V.P.

SAIC CONSTRUCTORS, LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties have made and executed this Agreement as of the day and year first above written.

EL DORADO AMMONIA L.L.C.

By: _____
Name: _____
Title: _____

SAIC CONSTRUCTORS, LLC

By: _____
Name: _____MICHAEL B. Guy_____
Title: _____PRESIDENT_____

**Exhibit H**
**LSB Guaranty**

This Parent Guaranty, dated as of _____, 2013 (as amended, supplemented or otherwise modified from time to time, this "Guaranty"), is made and entered into by LSB Industries, Inc., a Delaware corporation ("Guarantor"), in favor of SAIC CONSTRUCTORS, LLC, an Oklahoma limited liability corporation ("Beneficiary").

## RECITALS

A.   El Dorado Ammonia, LLC ("Owner") and Beneficiary have entered into that certain Engineering, Procurement and Construction Contract dated _____, 2013 (collectively, with all Attachments and Appendices and as amended, modified, supplemented, and otherwise in effect as of the date hereof, the "Contract"), pursuant to which Owner and Beneficiary have agreed on the terms and conditions set forth therein for the provision of certain goods and services for the Ammonia project site in El Dorado, Arkansas (the "Project");

B.   Guarantor is the ultimate parent of Owner;

C.   Owner is providing this Guaranty from Guarantor pursuant to the Contract; and

D.   Guarantor acknowledges that it will benefit from the transactions contemplated under the Contract.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

ARTICLE 1
DEFINITIONS

SECTION 1.01      Definitions.

"Beneficiary" has the meaning given in the preamble hereof.

"Contract" has the meaning given in Recital A hereof.

"Guaranteed Obligations" has the meaning given in Section 2.01 hereof.

"Guarantor" has the meaning given in the preamble hereof.

"Guaranty" has the meaning given in the preamble hereof.

"Maximum Guaranteed Amount" has the meaning given in Section 2.01 hereof.

"Owner" has the meaning given in Recital A hereof.

"Project" has the meaning given in Recital A hereof.

## ARTICLE 2
## THE GUARANTY

SECTION 2.01      The Guaranty.  Guarantor, as primary obligor and not merely as surety, hereby unconditionally, absolutely, and irrevocably guarantees to Beneficiary all obligations of Owner under the Contract, including the full and timely payment to Beneficiary of all amounts due and payable by Owner to Beneficiary under the Contract (the "Guaranteed Obligations"), less all amounts paid to Beneficiary under the Contract (the "Maximum Guaranteed Amount"). Beneficiary shall have no right to make a claim pursuant to this Guaranty unless and until an uncured default has occurred with respect to Owner's payments to Beneficiary under the Contract.

SECTION 2.02      Payment of Guaranteed Obligations.  Guarantor agrees, upon the failure of Owner to pay any of the Guaranteed Obligations when they become due and after the expiration of any applicable cure periods set forth in the Contract, that Guarantor will pay, or cause to be paid, any and all such unpaid Guaranteed Obligations in full upon receipt of written notice from a duly authorized officer of Beneficiary specifying such failure of Owner.

SECTION 2.03      Subsequent Recovery.  If, in connection with any payment by Guarantor of the Guaranteed Obligations, Beneficiary shall finally recover any such amounts from any other source directly making payments with respect to the Guaranteed Obligations, or it shall be finally determined that such Guaranteed Obligations were not owed to Beneficiary, Beneficiary shall promptly remit such amounts to Guarantor.

SECTION 2.04      Exercise of Remedies.  This Guaranty constitutes a guaranty of payment and not of collection, and the obligations of Guarantor under this Guaranty are primary obligations of Guarantor, and a separate action or actions may be brought and prosecuted against Guarantor to enforce this Guaranty, irrespective of whether any action is brought against Owner or any other guarantor or whether Owner or any other guarantor is joined in such action or actions.

SECTION 2.05      Insolvency.  The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, or other proceeding affecting Owner or the disaffirmance of the Contract in any such proceeding shall not release or discharge Guarantor from this Guaranty.

SECTION 2.06      Waiver; Consent.

(a)      Guarantor hereby unconditionally and irrevocably waives diligence, presentment, demand for payment, protest, the benefit of any discharge due to any disability of Owner, and all notices whatsoever in respect of the Guaranteed Obligations, this Guaranty, and any and all rights to require Beneficiary to exhaust any right, power or remedy or proceed against Owner under the Contract.

2

inure to the benefit of the successors and assigns of Beneficiary. This Guaranty and all obligations of Guarantor hereunder to Beneficiary shall be assignable by Guarantor only upon the prior written consent of Beneficiary. Any such assignee shall assume all of the obligations hereunder from and after the effective date of such assignment and in connection therewith, Guarantor shall be released from all obligations hereunder other than any obligations arising from acts or events that occurred prior to the date of such assignment.

SECTION 4.06     Headings.  The Article and Section headings in this Guaranty are for convenience only and shall not affect the construction of this Guaranty.

SECTION 4.07     Counterparts.  This Guaranty may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute the same instrument.  Delivery of an executed counterpart of a signature page of this Guaranty by facsimile or "pdf" electronically imaged transmission shall be effective as delivery of a manually executed counterpart of this Guaranty.

SECTION 4.08     Severability.  In case any one or more provisions contained in this Guaranty or obligation under this Guaranty shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or obligations contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

SECTION 4.09     Agreements Superseded.  This Guaranty supersedes all prior agreements and understandings, written or oral, between the parties with respect to the subject matter of this Guaranty.

SECTION 4.10     Governing Law.  This Guaranty shall be governed by and construed in accordance with the laws of the Oklahoma.

SECTION 4.11     Consent to Jurisdiction.  Guarantor hereby irrevocably consents to the non-exclusive personal jurisdiction of the state and federal courts located in Oklahoma City, Oklahoma, and any action, claim or other proceeding arising out of any dispute in connection with this Guaranty or any rights or obligations hereunder or thereunder or the performance of such rights and obligations.  Guarantor hereby irrevocably consents to the service of a summons and complaint and other process in any action, claim or proceeding brought by Beneficiary in connection with this Guaranty or any rights or obligations hereunder or thereunder or the performance of such rights and obligations, on behalf of itself, in the manner specified in Section 4.03 above.  Nothing in this Section 4.11 shall affect the right of Beneficiary to serve legal process in any other manner permitted by applicable law or affect the right of Beneficiary to bring any action or proceeding against Guarantor in the courts of any other jurisdiction.

SECTION 4.12     Termination.  This Guaranty shall terminate and be of no force and effect upon the expiration or satisfaction of all Guaranteed Obligations.

5

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be duly executed and delivered as of the day and year first above written.

LSB INDUSTRIES, INC., a
Delaware corporation


By: _____
Name: _____
Title: _____


ACCEPTED AND AGREED:

SAIC CONSTRUCTORS LLC, an
Oklahoma limited liability company


By: _____
Name: _____
Title: _____

agrmnt\edam\SAIC Engineering Procurement & Construction Services 2013 - Parent Guaranty – Payment Exhibit

## Exhibit I

### Certain Security, Safety and Regulatory Requirements

Per section 2.1.18 of the Contract, the EPC Contractor will maintain a pro-active safety and security program, in fulfillment of and in compliance with all legal and regulatory requirements. The Site requirements include, but are not necessarily limited, to the following:

### General Contractor Requirements

All contractors on the Site must meet the requirements of the Owner's S-004 "Contractor Selection and Safety Guidelines" Revision 6 dated June 18, 2013.

### Arkansas State Licensing Law for Commercial Contractors

The Arkansas Code and Rules and Regulations Act 150 of 1965 and Act 162 of 1987 (as amended) requires that any contractor must have a state contractor's license to bid on and work on construction projects in Arkansas that cost $20,000 or more. The EPC Contractor will be responsible for ensuring all subcontractors have a valid state license before performing any work on the Site.

### U.S. Department of Labor Occupational Safety and Health Administration (OSHA)

Compliance with all OSHA regulations is required. The two primary applicable sections are 29 CFR 1926 for the construction industry and 29 CFR 1910.119 "Process safety management of highly hazardous chemicals".

OSHA 29 CFR 1926 standards most frequently applicable to construction are:

1. Scaffolding
2. Fall protection (scope, application, definitions)
3. Excavations (general requirements)
4. Ladders
5. Head protection
6. Excavations (requirements for protective systems)
7. Hazard communication
8. Fall protection (training requirements)
9. Construction (general safety and health provisions)
10. Electrical (wiring methods, design and protection)

OSHA 29 CFR 1910.119 "Process safety management of highly hazardous chemicals" lists these chemicals in its Appendix A which are applicable to the processes being constructed:

1) Anhydrous Ammonia and Solutions greater than 44% ammonia content (ammonia plant and OSBL facilities containing ammonia)

2) Nitric acid at concentration equal to or greater than 94.5% (nitric acid concentration NACSAC® process and related OSBL facilities containing the concentrated nitric acid)

3) Nitric Oxides in portions of the nitric acid NACSAC® concentration process and the Weatherly "DMW2" regular nitric acid process.

Although these materials will not be in the processes through the mechanical completion phase, any design performed by the contractor shall conform to these OSHA 29 CFR 1910.119 design and construction requirements.

## Environmental Regulations

The Work must comply with all regulations of the U.S. Environmental Protection Agency (EPA) and the Arkansas Department of Environmental Quality (ADEQ). No construction activity deemed by EPA and ADEQ as a Site improvement may begin until the ADEQ has issued a construction permit. Purchase and staging of construction materials and equipment, Site preparation such as demolition and re-grading and mobilization of the construction organization to the Site are allowed prior to the issuance of the construction permit. The project must conform to all requirements of the final permit.

Other areas of environmental compliance for the Work may include, but are not limited to:

- Storm Water Run-Off: The Site has a National Pollutant Discharge Elimination System (NPDES) permit. Any work that may include a change in storm water run-off, erosion or sediment control must be approved by the Owner.

- Dredged and Fill Material: Dredged material (i.e., material that is dredged or excavated from waters of the United States) or fill material (i.e., material that replaces an aquatic area with dry land or changes the bottom elevation of a water body) requires a permit under Section 404 of the Clean Water Act.

- Solid and Hazardous Wastes: Examples of materials at construction sites that may be classified as hazardous wastes include: spent cleaners (e.g., organic solvents), paints (including lead-based paint), used oil, paint thinners, wastes that contain ignitable and corrosive materials and wastes that contain certain toxic pollutants. A list of hazardous wastes and their allowed concentrations is in the regulations that implement the Resource Conservation and Recovery Act (RCRA). These regulations also contain requirements for managing, treating, and disposing of hazardous wastes.

- Lead-Based Paints: If there are any lead-based paints (LBP) encountered during the Work, EPA regulations may apply. Persons who are involved in lead-abatement projects or who perform certain lead-based paint activities shall be certified to do the work under 40 CFR Part 745 or an authorized state program, and the work has to be done in accordance with work practice standards in 40 CFR Part 745.

- Waste Disposal: Collecting, storing and transporting certain materials which are treated as universal waste (i.e., items such as batteries, thermostats and fluorescent lamps that contain mercury etc.) must follow the Site procedures and RCRA requirements for recycling, treatment, or disposal of the wastes. Construction and Demolition (C&D) wastes such as wood, roof material, insulation, plaster, or sheet rock that end up in either

2

a municipal solid waste landfill or a landfill devoted exclusively to C&D wastes are subject to Site and ADEQ/EPA's landfill criteria.

- Storage Tanks for Petroleum Products: Materials such as gas or diesel fuel may be subject to the requirements of either RCRA, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), or the Oil Pollution Act, which dictate how to store, label, and dispose of these materials, and plan for spill prevention.

- Spill Reporting: Emergency planning and reporting requirements for hazardous chemicals under the Emergency Planning and Community Right-to-Know Act (EPCRA) and for oil under the Oil Pollution Act depend on the material handled. If there is a spill or release of more than a reportable quantity by the EPC Contactor or its subcontractors on the Site, it must be immediately reported to Owner and the proper authority. EPCRA also requires that EPC Contactor or its subcontractors maintain a material safety data sheet (MSDS) for all materials on the construction site that contain hazardous chemicals.

- Excavated Soils (Superfund Liability): If excavated soils contain a hazardous substance under CERCLA rules, it must be immediately reported to Owner's management for determination of proper handling.

- PCB Wastes: Any polychorinated biphenol (PCB) wastes (e.g., fluorescent light ballasts containing PCBs in the potting material, old transformers that contain PCBs) during C&D activity of the Work must be immediately reported to Owner and meet requirements for storage and disposal of PCB waste under the Toxics Substances Control Act (TSCA).

- Clean Air Act (CAA) Requirements: Mobile and stationary sources (e.g. heavy trucks, space heaters, dust control issues) may be subject to requirements of the CAA.

- Asbestos: If the combined amount of regulated Asbestos-Containing Material (RACM) demolish or renovate a facility (i.e., a material that contains greater than one percent asbestos) in the facility is at least 260 linear feet of pipe, 160 square feet of other facility components, or 35 cubic feet of facility components when the length or area cannot be measured, the National Emission Standard for Hazardous Air Pollutants (NESHAP) for asbestos shall be met. It requires, among other things, that EPA be notified when a facility is demolished. When a facility is renovated, EPA has to be notified only if the renovated facility contains the above combined amount of RACM. Asbestos also is a hazardous substance when it is in a form that can be reduced to dust by hand pressure (i.e., it is friable). If friable asbestos is present at the construction site, it may be subject to requirements under CERCLA.

## Security

The Site is regulated by the U.S. Department of Home Security (DHS) under the Chemical Facility Antiterrorism Standards (CFATS) and must follow certain Risk-Based Performance Standards (RBPS). Some of the requirements include:

- RBPS 3 – Screen and Control Access, is focused on the identification, screening, and/or inspection of individuals and vehicles as they enter and exit the facility or restricted areas within a facility. Under this requirement the EPC Contactor, its subcontractors, drivers or

3

other personnel passing through the controlled facility perimeter will be subject to the Owner's requirements for identification and badging, background checks, inspections of vehicles and containers entering or exiting the Site and compliance with applicable Site security regulations.

- RBPS 12 – Personnel Surety requires the chemical facility to ensure that individuals allowed on-site have passed suitable background checks. This will apply to the EPC Contactor, its subcontractors, drivers or other personnel passing through the controlled facility perimeter. The DHS is also developing a final rule which may allow other government-issued documents which meet this requirement such as a commercial driver's license with a Haz-mat endorsement or a TWIC card in lieu of a separate background check. The four elements required of a background check are:

  1. Measures designed to verify and validate identity: This typically involves a social security/name trace search, which reveals names associated with a social security number, past and present addresses, and fraudulent use of social security numbers. Results may also be used to cross-reference addresses supplied by the applicant to ensure the integrity of the information on the job application or resume.

  2. Measures designed to check criminal history: This typically involves a search of publicly or commercially available databases, such as county, state, and/or Federal criminal record repositories for jurisdictions in which an individual has worked or resided. A typical criminal history search would uncover any criminal charges, outstanding warrants, dates, sentencing, and disposition for felonies and/or misdemeanors. In conducting or evaluating such a search, a facility may wish to consult the federally established list of disqualifying crimes applicable to hazmat drivers and transportation workers at ports (see 49 CFR § 1572.103). A second type of search that often is used to check criminal history is a national criminal scan. A national scan serves as a supplement to criminal history searches by searching to identify criminal activity in jurisdictions outside of the geographical locations of current and previous residence and employment.

  3. Measures designed to verify and validate legal authorization to work: The standard way to validate legal authorization to work is through the filing of U.S. Citizenship and Immigration Services (USCIS) Form I-9: Employment Eligibility Verification or through DHS's E-Verify program.

  4. Measures designed to identify people with terrorist ties: Because information regarding terrorist ties is not publicly available, DHS is in the process of developing a system through which regulated facilities will be able to have relevant individuals screened by DHS through the Terrorist Screening Database (TSDB). When this system is in place the EPC Contactor and Owner will agree to a system to meet this requirement.

4

A person without the required background check must be continuously accompanied by a vetted individual with a secure background check and authorized by the Owner. Use of this option will be restricted by the Owner, and whenever possible persons working inside the Site security perimeter must have a background check before working on the Site.

'5

agrmnt\edam\SAIC Engineering Procurement & Construction Services 2013 - Security Safety & Regulatory Requirements Exhibit